The **LANGDALE COMPANY,** Plaintiff,

v.

**NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PENNSYLVANIA,** Defendant.

Civil Action No. 1:12–CV–02422–SCJ.

United States District Court,
N.D. Georgia,
Atlanta Division.

Signed June 3, 2014.

Filed June 4, 2014.

Charles Neal Pope, David Cowan Rayfield, George W. Walker, III, Shaun P. O'Hara, Wade H. Tomlinson, III, Paul V. Kilpatrick, Jr., Pope McGlamry Kilpatrick, Morrison & Norwood, Columbus, GA, for Plaintiff.

Catherine Salinas Acree, Christopher B. Freeman, Walter Holloway Bush, Jr., Carlton Fields Jorden Burt, PA, Atlanta, GA, for Defendant.

## ORDER

STEVE C. JONES, District Judge.

This matter appears before the Court on Plaintiff's Motion for Partial Summary Judgment [Doc. No. 50] and Defendant's Motion for Summary Judgment [Doc. No. 69].

## I. Factual Background

On July 12, 2012, Plaintiff, The Langdale Company ("Plaintiff," "Langdale", or "TLC") filed a Complaint against National Union Fire Insurance Company of Pittsburgh, Pennsylvania ("Defendant" or "National Union"). Doc. No. 1. Langdale's Complaint was amended and recast on August 21, 2012. Doc. No. 7. In its Complaint, Langdale asserts claims for breach of contract (count one); bad faith refusal to advance defense costs (count two); and declaratory judgment (count three).

A review of the record shows the following facts.[1]

Langdale is a Georgia Corporation.

For the calendar year April 1, 2009 to April 1, 2010, Langdale purchased a "claims made" insurance policy issued by National Union, to wit: Policy No.: 01–754–82–11, with an effective date of April 1, 2009, (the "Policy"). A true and accurate copy of the Policy that was issued by National Union is found in the record at Doc. No. 52–1. The Policy was the first policy issued by National Union to Langdale. The Policy issued to Langdale replaced an expiring insurance policy that was issued by Chubb Group of Insurance Companies (Federal Insurance Company).

National Union issued a temporary binder for Directors and Officers coverage to Langdale on March 31, 2009.[2] On April 30, 2009, another temporary binder was issued to Langdale.[3] On May 30, 2009, National Union issued a Temporary and Conditional Binder to Langdale.[4] The ef-

---

1. These facts were derived from the parties' Statements of Material Facts. Doc. Nos. 52, 68, 69, 76, 77, and 84.

2. Said temporary binder included a provision that stated: "A condition precedent to coverage afforded by this Conditional Binder is that no material change in the risk occurs and no submission is made to the Insurer of a claim or circumstances that might give rise to a claim between the date of this Conditional Binder indicated above and the Effective Date." Doc. No. 77–40, p. 8.

3. Said temporary binder included a provision that stated: "A condition precedent to coverage afforded by this Conditional Binder is that no material change in the risk occurs and no submission is made to the Insurer of a claim or circumstances that might give rise to a claim between the date of this Conditional Binder indicated above and the Effective Date." Doc. No. 77–41, p. 8.

4. Said temporary binder included a provision that stated: "A condition precedent to coverage afforded by this Conditional Binder is that no material change in the risk occurs and no submission is made to the Insurer of a claim or circumstances that might give rise to a claim between the date of this Conditional Binder indicated above and the Effective Date." Doc. No. 77–42, p. 8.

fective date of the Policy remained April 1, 2009 with every continuation of the temporary binder. On July 2, 2009, National Union mailed the Policy to Langdale; however, the Policy erroneously included an Endorsement 15. Endorsement 15 never was referenced on any of the binders issued by National Union and was not intended to be a part of the coverage bound. On July 7, 2009, National Union mailed a correct Policy to Langdale as originally bound with an effective date of April 1, 2009. The Policy mailed on July 7, 2009 had a completed Endorsement 8 and removed Endorsement 15.[5]

The Policy included a Directors and Officers (D & O) coverage section with a limit of liability of $10 million and a $100,000.00 deductible. National Union is required under the Policy to advance Defense Costs prior to the final disposition of a Claim (when the Claim is covered). The Policy does not include an allocation provision for Defense Costs.

On May 21, 2009, The Virginia Langdale Miller family filed a lawsuit against Johnny W. Langdale, Jr., Harley Langdale, Jr., and Johnny W. Langdale, Jr., as Executor of the Estate of John W. Langdale, Sr. styled *Langdale Miller Nalley, et al. v. John W. Langdale, Jr.; Harley Langdale Jr.; and John W. Langdale Jr., as Executor of the Estate of John W. Langdale, Sr.,* Civil Action, 2009–CV–1343, Superior Court of Lowndes County, Georgia (hereinafter the "Miller Lawsuit" or "1343 Suit"). A true and correct copy of the Miller Lawsuit is found in the record at Doc. No. 52–4.

The Miller Lawsuit is against two of The Langdale Company's shareholders, Harley Langdale ("Harley") and Johnny Langdale, Jr. ("Johnny"). The Miller Lawsuit

included a Count titled "Count Three Breach of Fiduciary Duty as Director" and was expressly brought against Johnny Langdale in his capacity as a Director of The Langdale Company.

On June 22, 2009, following service of the Miller Lawsuit, Johnny Langdale, Jr. sent a letter seeking indemnification from Langdale. The record testimony indicates that Langdale has fully paid the lawyers for Johnny Langdale.

On October 20, 2009, Langdale filed a Declaratory Judgment action styled *The Langdale Company v. Harley Langdale, Jr. et al.,* Civil Action No. 2009–cv–2747, Superior Court of Lowndes County, State of Georgia ("hereinafter "Declaratory Judgment action" or "2747 Suit""). On November 13, 2009, the Virginia Langdale Miller family filed a Counterclaim in the Declaratory Judgment action against Langdale. The Counterclaim alleged that Langdale aided and abetted the alleged Trustees of the purported Trust, made misrepresentations together with the alleged Trustees, and schemed with the alleged Trustees. The Counterclaim filed in the Declaratory Judgment action included a Count V "Respondeat Superior Liability of [Langdale] for its Officers' Misconduct."

The Miller Lawsuit, the Declaratory Judgment action, and the Counterclaim were all consolidated into one action, *i.e.,* the Underlying Litigation. These consolidated cases, according to the Georgia Court of Appeals, concern a trust created in 1959 by Judge Harley Langdale, Sr. ("Judge Langdale") for the benefit of his daughter, Virginia Miller. The plaintiffs, who are beneficiaries under the trust or their legal representatives, filed suit in the Superior Court of Lowndes County, claim-

---

**5.** Langdale has filed a Motion to Strike and Objection to Evidence (specifically portions of the declaration of Aarica Williams) [Doc. No. 79] concerning Endorsement 15 never being a

"placeholder" for Endorsement 8 (to be discussed *infra*). Doc. No. 79, p. 13. The Court has addressed said motion by separate order.

ing, *inter alia*, that the trustees breached their fiduciary duties in administering the trust and in distributing the trust corpus, which was comprised of stock held in The Langdale Company.

At all times pertinent, Johnny Langdale, Jr. was an Executive/Employee of Langdale.

At all times pertinent, The Langdale Company was an insured under the Policy, as was Johnny Langdale, Jr., to the extent that he qualifies as an "Individual Insured," as that term is defined in the Policy.

On August 4, 2009, Langdale provided written notice to National Union of the claims made against Johnny Langdale in the Miller Lawsuit. Included with the August 4, 2009 notice to National Union was a copy of the demand for indemnification and advancement of Defense Costs Langdale received from Johnny Langdale. Also included with the August 4, 2009 notice to National Union was a copy of the Miller Lawsuit. National Union's Claims Analyst, Douglas Croland, was assigned to the Claim submitted by Langdale to National Union.[6]

After receiving notice of the Miller Lawsuit, National Union denied coverage under the Policy by letter dated November 12, 2009. In its letter, National Union stated that it had "carefully reviewed the insurance policy ... as well as the allegations asserted." The two grounds for denying coverage provided by National Union on November 12, 2009 (based on the lawsuit, not the counterclaim) were Endorsement No. 15 and exclusion 4(g). National Union's November 12, 2009 denial included a reservation of rights which read as follows:

National Union's coverage position is based on the information presently available to us. This letter is not, and should not be construed as a waiver of any terms, conditions, exclusions or other provisions of the Policy, or any other policies of insurance issued by National Union or any of its affiliates. National Union expressly reserves all of its rights under the Policy, including the right to assert additional defenses to any claims for coverage, if subsequent information indicates that such action is warranted.

Endorsement No. 15 is not an Endorsement in the Policy.

On November 25, 2009, Langdale responded to National Union's coverage denial (by letter from Attorney Thomas S. Richey ("Richey")) and notified National Union that Endorsement No. 15 was not part of the Policy. Langdale also requested that National Union withdraw its denial of coverage for the Miller Lawsuit. In that letter, Langdale's counsel stated, "That Endorsement was not in the coverage as offered and bound and is not a part of the Policy now. If you examine the March 19, 2009 quote and the March 31, 2009 binder for the Policy (attached), there was no mention of such an exclusion."

Also on November 25, 2009, Langdale tendered notice of a Counterclaim in the Declaratory Judgment action that was filed directly against Langdale and for which Langdale sought coverage under the Policy. On November 25, 2009, Langdale advised National Union that Johnny Langdale resigned as trustee before the purchase of stock from the Trust, so that [Johnny Langdale] could act on [Langdale's] behalf in consummating the transaction.

---

6. As to the timing of the notice of the Underlying Litigation, National Union, through its Claims Adjuster, Douglas Croland, has admit-

ted that the timing of the notice of the Underlying Litigation is not an issue.

National Union responded to Langdale's November 25, 2009 letters through its coverage counsel, John Jordak of Alston & Bird.

On March 26, 2010, National Union, via Alston & Bird, sent a letter to Langdale that abandoned Endorsement 15 and relied upon Exclusion 4(g) and the Policy's definition of Wrongful Act to again deny coverage. National Union, through its counsel did not rely upon Endorsement 8 ("Specific Investigation/Claim/Event or Act Exclusion") in its March 26, 2010 letter, although National Union was in possession of a 2008 State Suit and 2008 Federal Suit at the time.[7]

On June 25, 2010, Langdale sent another letter to Alston & Bird challenging National Union's denial.

On July 9, 2010, Alston & Bird sent a letter to Langdale requesting certain documents.

On October 13, 2010, National Union, by letter, agreed to advance reasonable Defense Costs (as defined in the Policy) for the defense of Johnny Langdale, Jr, against the allegations in Count III of the Miller Lawsuit. National Union's October 13, 2010 letter stated, "based upon National Union's review, and pursuant to the Policy, National Union agrees to advance reasonable Defense Costs (as defined in the Policy) for the defense of Johnny Langdale, Jr. against the allegations in Count III (and only Count III) of the Complaint in *Langdale Miller Nalley, et al. v. John W. Langdale, Jr., et al.*, Superior Court of Lowndes County, Georgia, Civil Action No.2009–CV–1343."

On November 3, 2010, National Union agreed to advance reasonable Defense Costs for the defense of The Langdale Company against the allegations in Count V of the Counterclaim.

On February 14, 2011, National Union agreed to advance Defense Costs in the amount of $202,510.55 for the defense of the Underlying Litigation.

On February 16, 2011, National Union agreed to advance Defense Costs in the amount of $102,510.55 for the defense of the Underlying Litigation.

On April 1, 2011, National Union agreed to advance 7.1% ($87,009.69) of the billed Defense Costs to Langdale.

National Union's 30(b)(6) witness, Reid Kleinle, admitted that the letters speak for themselves and that the language "offer" did not appear in National Union's letters

---

**7.** The 2008 State Suit ("2008 State Suit") was styled, *W.P. Langdale Family Properties, et al. v. John W. Langdale, Jr., et al.*, Civil Action No.2008–CV–1740, Superior Court of Lowndes County, Georgia. The 2008 State Suit was a direct action filed by several minority shareholders and a former director of The Langdale Company against seven directors of The Langdale Company, including Johnny and Harley. The Plaintiffs in the 2008 State Suit alleged breaches of fiduciary duty, aiding and abetting breaches of fiduciary duty, conspiracy to breach fiduciary duty, usurpation of corporate opportunities, waste of corporate assets, corporate self-dealing, and unjust enrichment.

The 2008 Federal Suit ("2008 Federal Suit") was styled *Robert Harley Langdale, et al. v. John W. Langdale, Jr., et al.*, Civil Action No. 7:08–cv–00101–WLS, United States District Court for the Middle District of Georgia Valdosta Division. The 2008 Federal Suit involved the handling of the "H. Langdale Trust B." The H. Langdale Trust B was created by Judge Harley Langdale, Sr., in his last will and testament. The H. Langdale Trust B involved personal assets of Judge Harley Langdale, Sr. The 1959 Trust (which was involved in the L999 and 2000 Redemption Transaction) and the H. Langdale B Trust were completely different trust instruments involving completely different assets and beneficiaries. The 2008 Federal Suit alleged that Johnny Langdale, Jr. breached the trust by taking money from the corpus of the Trust for his personal use and profit through an interstate RICO conspiracy.

agreeing to advance reasonable Defense Costs.[8]

National Union has never made any payment to Langdale relating to the defense of the Miller Lawsuit. National Union has never made any payment to Langdale relating to the defense of the Counterclaim filed in the Declaratory Judgment action.

In April 2011, the trial court in the Underlying Litigation granted summary judgment in favor of Johnny Langdale on the plaintiffs' claims. The trial court also granted summary judgment in favor of Langdale on the plaintiffs' claims in the Underlying Litigation. On April 20, 2011, Langdale's counsel notified National Union that the trial court granted summary judgment motions filed by Langdale and Johnny Langdale in the Underlying Litigation. The plaintiffs in the Underlying Litigation appealed those rulings. The Court of Appeals issued an opinion on November 30, 2012, which affirmed in part, and reversed in part, the trial court's rulings. The Court of Appeals found sufficient evidence from which a jury might infer that Langdale—through some of its officers and the majority of its directors—aided and abetted the trustees in the alleged breach of their fiduciary duties. This matter is now returning to the trial court as the Georgia Supreme Court denied Langdale's petition for writ of certiorari on April 29, 2013.

National Union replaced Alston & Bird as coverage counsel with Carlton Fields to handle the Langdale claim for coverage.

On November 11, 2011, after the change of counsel, National Union's current counsel sent a letter to Langdale that contains a coverage denial based on Endorsement 8 and Exclusion 4(d), and a reservation of rights as to several other Policy provisions, including Exclusion 4(g).

On May 7, 2012, Langdale made one final demand on National Union pursuant to O.C.G.A. § 33–4–6. This demand was prior to filing the present lawsuit for breach of contract, bad faith, and declaratory judgment on July 12, 2012. National Union responded to Langdale's May 7, 2012 bad faith demand letter by again refusing to reimburse and advance Langdale's Defense Costs.

Langdale has incurred expenses related to the defense of itself and its indemnity of Johnny Langdale, Jr. for his defense costs in the Underlying Litigation.

Additional facts will be discussed in the next sections of this Order.[9]

On August 21, 2013, in the case *sub judice*, Langdale moved for summary judgment on its claims for breach of contract and declaratory judgment. Doc. No. 50–1, p. 11. On September 18, 2013, National Union moved for summary judgment on all claims stated in Langdale's Amended Complaint. Doc. No. 69. These motions have been fully briefed and after the benefit of an April 7, 2014 oral argument, are now ripe for review.

## II. Legal Standard

Federal Rule of Civil Procedure 56(a) provides "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[10]

---

8. Langdale has filed a Motion to Strike and Objection to Evidence a statement made by National Union in its summary judgment briefing characterizing Alston & Bird's agreement as an "offer." Doc. No. 79. The Court has addressed said motion by separate order.

9. The Court also notes that Langdale raised numerous allegations that National Union has made misleading and false representations to the Court. Doc. No. 75, pp. 13–20. After lengthy review and study of the record, the Court has been able to separate the wheat from the chaff and render its order.

10. On December 1, 2010, an amended version of Rule 56 of the Federal Rules of Civil Procedure became effective. The amendments to

A factual dispute is genuine if the evidence would allow a reasonable jury to find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" if it is "a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir.1997).

The moving party bears the initial burden of showing the court, by reference to materials in the record, that there is no genuine dispute as to any material fact that should be decided at trial. *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir.2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). The moving party's burden is discharged merely by " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support [an essential element of] the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining whether the moving party has met this burden, the district court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion. *Johnson v. Clifton*, 74 F.3d 1087, 1090 (11th Cir.1996). Once the moving party has adequately supported its motion, the non-movant then has the burden of showing that summary judgment is improper by coming forward with specific facts showing a genuine dispute.

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). All reasonable doubts should be resolved in the favor of the non-movant. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir.1993). When the record as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine [dispute] for trial." *Id.* (citations omitted).

## III. Analysis

Langdale moves for a grant of partial summary judgment on its claims for breach of contract and declaratory judgment. Doc. No. 50. National Union moves for summary judgment on all claims stated in Langdale's Amended Complaint. Doc. No. 69. The Court will address the arguments of the parties as follows.

### A. Scope of National Union's defenses

The Court must first determine the scope and number of defenses that National Union may assert in this litigation.

Langdale argues that National Union's coverage defenses are limited to those contained in the first denial of coverage letter sent November 12, 2009. In support of its argument, Langdale argues *in judicio* admission and waiver.

#### a. *in judicio* admission

■■■ "Judicial admissions are 'formal concessions in the pleadings, or stipulations by a party or its counsel, that are

---

Rule 56 "are intended to improve the procedures for presenting and deciding summary-judgment motions" and "are not intended to change the summary-judgment standard or burdens." Committee on Rules of Practice and Procedure, Report of the Judicial Conference, p. 14 (Sept. 2009). *Farmers Ins. Exch. v. RNK, Inc.*, 632 F.3d 777, 782 n. 4 (1st Cir.2011). "[B]ecause the summary judgment standard remains the same, the amendments 'will not affect continuing development

of the decisional law construing and applying' the standard now articulated in Rule 56(a). Adv. Comm. Notes to Fed.R.Civ.P. 56 (2010 Amends.). Accordingly, while the Court is bound to apply the new version of Rule 56, the undersigned will, where appropriate, continue to cite to decisional law construing and applying prior versions of the Rule." *Murray v. Ingram*, No. 3:10–CV–348–MEF, 2011 WL 671604, at *2 (M.D.Ala. Feb. 3, 2011).

binding upon the party making them.'" *In re Malia,* No. 09–42273, 2012 WL 909738, *2 (Bkrtcy.N.D.Ga. Feb. 8, 2012) (quoting *Keller v. United States,* 58 F.3d 1194, 1199 n. 8 (7th Cir.1995)). "Judicial admissions must be clear, deliberate, and unequivocal factual assertions—whether made in pleadings, stipulations, responses to discovery, or orally in trial or court proceedings." *Id.*

Langdale argues that "[b]ecause National Union, through its present counsel, has now made an *in judicio* admission that the [non-coverage] decision was made and the claims process ended on November 12, 2009, the only analysis that is required is to examine the two bases for the denial ..." as stated in the initial denial letter, dated November 12, 2009. Doc. No. 50–1, p. 12.

In response, National Union denies making an *in judicio* admission. Doc. No. 68, p. 12. National Union argues that "[g]iving an initial opinion about a contract does not preclude a party to the insurance contract from offering a different opinion based on new information obtained thereafter—irrespective of the 'mode' it might be operating under." Doc. No. 68, p. 12. National Union indicates that operating in a litigation mode, as it understands to be defined by Langdale as a period of anticipating litigation [Doc. No. 68, p. 13], does not change, alter or modify the insurance contract or the complaint/counterclaim filed against Johnny Langdale and The Langdale Company. *Id.* at p. 13.

For purposes of the present summary judgment ruling, it is not necessary to determine whether National Union made an *in judicio* admission, as even if National Union is deemed to have made a judicial admission (as to when the first non-coverage decision was made and the claims process ended), based on the case law discussed in the next section of this order (concerning waiver and estoppel), the Court is unable to conclude that the asserted *in judicio* admission (concerning when the non-coverage decision was made and when the claims process ended) limits the defenses that National Union may raise.

#### b. waiver

Langdale argues that under Georgia law, recently affirmed by the Georgia Supreme Court in *Hoover v. Maxum Indem. Co.,* 291 Ga. 402, 730 S.E.2d 413 (2012), National Union waived all policy defenses not raised in its first denial of coverage on November 12, 2009. Doc. No. 75, p. 38. In response, National Union argues that it has not waived defenses not raised in its initial denial of coverage letter, and attempts to distinguish *Hoover* by relying upon the case of *Bank of Camilla v. St. Paul Mercury Ins. Co.,* 939 F.Supp.2d 1299 (M.D.Ga.2013). National Union further argues that the general rule that a party cannot create coverage by waiver or estoppel applies to this case. Doc. No. 69–1, p. 19.

In *Hoover,* the Georgia Supreme Court stated:

> Under Georgia law, where an insurer is faced with a decision regarding how to handle a claim of coverage at the same time a lawsuit is pending against its insured, the insurer has three options. First, the insurer can defend the claim, thereby waiving its policy defenses and claims of non-coverage. *Gant v. State Farm Mut. Auto. Ins. Co.,* 109 Ga.App. 41, 43–44, 134 S.E.2d 886 (1964). Second, the insurer can deny coverage and refuse to defend, leaving policy defenses open for future litigation. *Southern Guar. Ins. Co. v. Dowse,* 278 Ga. 674(1), 605 S.E.2d 27 (2004). Or, third, the insurer can defend under a reservation of rights. *Id.* at 676, 605 S.E.2d 27 (insurer "had a choice when timely notified of the claim pending against its insured—either defend under a reserva-

tion of rights or decline to defend"). An insurer cannot both deny a claim outright and attempt to reserve the right to assert a different defense in the future. *See Browder v. Aetna Life Ins. Co.*, 126 Ga.App. 140, 144(2), 190 S.E.2d 110 (1972) ("ultimate denial of liability on another ground constitutes a waiver of forfeiture based on the lack of timely notice"). *Cf. Morgan v. Guaranty Nat. Cos.*, 268 Ga. 343, 344, 489 S.E.2d 803 (1997) (insurer cannot deny a claim and then seek declaratory judgment to determine the propriety of the denial; declaratory judgment is only available where the insurer undertakes a defense but is uncertain how to handle the claim).

A reservation of rights is a term of art in insurance vernacular and is designed to allow an insurer to provide a defense to its insured while still preserving the option of litigating and ultimately denying coverage. *National Union Fire Ins. Co. v. American Motorists Ins. Co.*, 269 Ga. 768, 769(1), 504 S.E.2d 673 (1998). "At a minimum, the reservation of rights must fairly inform the insured that, notwithstanding [the insurer's] defense of the action, it disclaims liability and does not waive the defenses available to it against the insured." *World Harvest Church, Inc. v. Guideone Mut. Ins. Co.*, 287 Ga. 149, 152(1), 695 S.E.2d 6 (2010) (Citation and punctuation omitted; emphasis supplied.) Thus, a reservation of rights is only available to an insurer who undertakes a defense while questions remain about the validity of the coverage. 291 Ga. at 404–05, 730 S.E.2d at 416.

Langdale argues that *Hoover* "expressly forbids what National Union has attempted here, that is the outright denial of a claim with a boilerplate reservation of rights and the later (2 plus years later)

attempt to assert new and different coverage defenses." Doc. No. 75, p. 35.

As noted above, National Union attempts to distinguish *Hoover* by relying upon the case of the *Bank of Camilla*, 939 F.Supp.2d 1299. In *Bank of Camilla*, the district court held that *Hoover* was inapposite where an insurance policy only provided for a duty to pay costs. *Id.* at 1305. The court stated that because the insurance policy only provided for a duty to pay costs, the defendant's alleged failure to assert all of its defenses at the time of coverage denial did not prevent it from raising those rights at a later time. *Id.* at 1305. The court reached this conclusion after noting that "[c]ourts ... have drawn a distinction between the duty to defend and the duty to pay costs, finding that a refusal to defend does not affect the insurer's right to refuse payment of costs." *Id.* In support of this statement, the court cited two Georgia cases: *Penn–Am. Ins. Co. v. Disabled Am. Veterans*, 224 Ga.App. 557, 481 S.E.2d 850, 852 (1997), *aff'd* 268 Ga. 564, 490 S.E.2d 374 (1997) ("an insurer's duty to pay and its duty to defend are separate and independent obligations"); *Aetna Cas. & Sur. Co. v. Empire Fire & Marine Ins. Co.*, 212 Ga.App. 642, 442 S.E.2d 778, 783 (1994) ("While it is true that an insurer loses its opportunity to contest the negligence of the insured or the injured person's right to recover by refusing to defend, the insurer does not lose its right to contest the insured's entitlement to a recovery under its policy.").

National Union argues that a similar finding is warranted here in that it has no duty to defend under the language of the policy (as Langdale did not tender the defense to National Union)—and only has an obligation to advance defense costs. Doc. No. 69–1, p. 21; Doc. No. 85, p. 2, n. 1.[11] National Union argues that an obli-

---

11. The applicable Policy provisions state in relevant part:

**DEFENSE PROVISIONS**

gation to advance defense costs "is simply a part of the duty to indemnify ... and is thus limited by the express terms of the insurance contract." *Id.*[12] Langdale argues that the duty to defend and the duty to advance defense costs are the same" and that it is essentially an apples to oranges comparison to equate indemnity with defense costs. ˙ Doc. No. 75, p. 36.

Georgia courts have not had the opportunity to address this issue first hand; however, the case of *George L. Smith II ˙ Georgia World Congress Ctr. Auth. v. Mil- ler Brewing Co.*, 255 Ga.App. 643, 566 S.E.2d 361 (2002) provides guidance. In the *Smith* case, the Georgia Court of Appeals used language that suggests to the Court that Georgia courts consider the duty to defend or pay the expenses of litigation analogous, but separates these duties from the duty to indemnify. Said language is as follows: "[t]he language [of the indemnity agreement] focuses only on ... duty to indemnify ... for liabilities and ˙claims of liability, **not on the legally separate duty to defend .... or to pay**

> The **Insurer** does not assume any duty to defend; provided, however, the **Named Entity** may at its sole option tender to the Insurer the defense of a Claim for which coverage is provided by this **D & O Coverage Section** in accordance with and subject to Clause 7 of this **D & O Coverage Section**. Regardless of whether the defense is so tendered, the Insurer shall advance **Defense Costs** of such **Claim**, excess of the applicable Retention amount, prior to its final disposition.

Doc. No. 52–1, p. 21.

**DEFENSE COSTS, SETTLEMENTS, JUDGMENTS (INCLUDING THE ADVANCEMENT OF DEFENSE COSTS)**

The **Insurer** does not assume any duty to defend. The **Insureds** shall defend and contest any **Claim** made against them. Notwithstanding the foregoing, the **Insureds** shall have the right to tender the defense of the **Claim** to the **Insurer,** which right shall be exercised in writing by the **Named Entity** on behalf of all **Insureds** to the **Insurer** pursuant to the notice provisions of Clause 12 of the **General Terms and Conditions**. This right shall terminate if not exercised within thirty (30) days of the date the Claim is first made against an Insured. Further, from the date the **Claim** is first made against an **Insured** to the date when the Insurer accepts the tender of the defense of such **Claim,** the **Insureds** shall take no action, or fail to take any required action, that prejudices the rights of any **Insured** or the **Insurer** with respect to such **Claim.** Provided that the **Insureds** have complied with the foregoing, the **Insurer** shall be obligated to assume the defense of the **Claim,** even if such **Claim** is groundless, false or fraudulent.

> . . . .
>
> Once the defense has been so tendered, the **Insured** shall have the right to effectively associate with the Insurer in the defense and the negotiation of any settlement of any **Claim,** subject to the provisions of this Clause 7; provided, however, the **Insurer** shall not be obligated to defend such **Claim** after the **Policy Aggregate Limit of Liability** or any applicable **Separate Limit of Liability** or **Shared Limit of Liability** have been exhausted.
>
> When the **Insurer** has not assumed the defense of a **Claim** pursuant to this Clause 7, the **Insurer** nevertheless shall advance, at the written request of the **Insured, Defense Costs** prior to the final disposition of a **Claim.** Such advanced payments by the **Insurer** shall be repaid to the **Insurer** by each and every Insured or the Company, severally according to their respective interests, in the event and to the extent that any such **Insured** or the **Company** shall not be entitled under the terms and conditions of this **D & O Coverage Section** to payment of such **Loss.**
>
> . . .
>
> [I]n all events the **Insurer** may withhold consent to any ... **Defense Costs** ... to the extent such **Loss** is not covered under the terms of this **D & O Coverage Section.**

Doc. No. 52–1, pp. 30–31.

12. In its objections and responses to Langdale's statement of material facts, National Union states that "[t]he distinction is between indemnification for defense costs versus indemnification for damages." Doc. No. 84, p. 71.

for expenses of litigation or attorney fees." *Id.* at 363 (emphasis added). There is also persuasive authority that suggests that a duty to pay defense costs and the duty to defend are different, but similar in result, then concludes that the parameters of the duty to defend guide the analysis of a duty to pay defense costs. *See Liberty Mut. Ins. Co. v. Pella Corp.,* 650 F.3d 1161, 1170–71 (8th Cir.2011).

Returning to the *Bank of Camilla* case, the Court finds that it is not binding upon this court, nor is it controlling on this issue. *See McGinley v. Houston,* 361 F.3d 1328, 1331 (11th Cir.2004) ("The general rule is that a district judge's decision neither binds another district judge nor binds him."). The Court concludes that the Georgia cases relied upon in *Bank of Camilla* for the distinction between a duty to defend and a duty to pay costs refer to the duty to pay claims against the insurance policy, not a duty to pay the costs of litigation, which is at issue here. *See Henning v. Cont'l Cas. Co.,* 254 F.3d 1291, 1295 (11th Cir.2001) ("[t]he duty to defend a suit, however, is an independent obligation from the duty to pay claims against the insurance policy" (citing *Colonial Oil Indus. v. Underwriters,* 268 Ga. 561, 491 S.E.2d 337, 339 (1997))).

■ The Court concludes that the duty to defend and the duty/obligation to pay costs of litigation should be treated as analogous for purposes of consideration of the applicability of the holding in *Hoover*;[13] therefore, the holding of the *Hoover* case is not distinguishable on this ground. The Court must now turn its attention to Na-

tional Union's second argument, *i.e.,* that Langdale's interpretation of *Hoover* is contrary to the general rule that a party cannot create coverage by waiver or estoppel and there is no basis for finding waiver under *Hoover.* Doc. No. 69–1, pp. 19, 22.

■ National Union is correct in that there is a "longstanding general rule [in Georgia law] ... that neither waiver nor estoppel can be used to create liability not created by an insurance contract and not assumed by the insurer under the terms of the policy." *Andrews v. Ga. Farm Bureau Mut. Ins. Co.,* 226 Ga.App. 316, 317, 487 S.E.2d 3, 4 (1997);[14] *see also Colonial Oil Indus., Inc.,* 268 Ga. at 562, 491 S.E.2d at 339 ("The breach of the duty to defend, however, should not enlarge indemnity coverage beyond the parties' contract.") and *Danforth v. Gov't Emps. Ins. Co.,* 282 Ga.App. 421, 427, 638 S.E.2d 852, 858–59 (2006) ("An insurer may waive any provision in an insurance policy inserted for its benefit, and may waive any condition or limitation in the policy upon which it could otherwise rely. It is well established, however, that the doctrines of implied waiver and estoppel, based upon the conduct or action of the insurer, or its agent, are not available to bring within the coverage of a policy risks not covered by its terms, or risks expressly excluded therefrom. Here, [there was no] right to expect coverage under [the] policy for the collision at issue because the express language of the policy foreclosed coverage.") (internal citations and alterations omitted).

In response to National Union's general rule argument, Langdale argues that the

---

13. In reaching this conclusion, the Court has thoroughly reviewed National Union's arguments and citations of authority showing differences between a duty to defend and a duty to pay litigation costs [Doc. No. 68, p. 11].

14. The only recognized exception to this rule is when an insurer undertakes a defense of its insured without reserving its rights. *Pres-*

*cott's Altama Datsun v. Monarch Ins. Co.,* 253 Ga. 317, 318, 319 S.E.2d 445 (1984); *see also Facility Invests., LP v. Homeland Ins. Co. of New York,* 321 Ga.App. 103, 109, 741 S.E.2d 228, 233 (2013) (citing the *Prescott* holding post Hoover). Said exception is not applicable under the present facts before the Court, which do not show an undertaking of a defense by the insurer.

issue of whether a breach of duty to defend results in a waiver of defenses to the duty to indemnify is not present here because there is no issue as to indemnity at this time. Doc. No. 75, p. 37. Langale argues that the Court should apply a liability standard, as opposed to an indemnity standard [15]—with the result being, there is no creation of coverage by estoppel, as National Union's arguments only apply when a person is trying to create coverage that otherwise does not exist. Langdale argues that here, there is coverage, but National Union is asserting that an exclusion to said coverage applies.

. The Court must reconcile, Langdale's arguments, the general rule asserted by National Union, and *Hoover.*

As to Langdale's argument as to the distinction between liability and indemnity standards, the Court is unable to uphold said argument as even in *Hoover,* the seminal duty to defend case, the Georgia Supreme Court recognizes forfeiture and waiver principles in the duty to defend context and states that "courts infer waiver of non-essential parts of an insurance contract that are penal in nature." *See Hoover,* 291 Ga. at 407, 730 S.E.2d at 418. The *Hoover* court did not state that there would be waiver of essential parts of the contract. To this regard, the Court is not convinced that waiver and estoppel principles should not be applied in the present context of ascertaining whether there has been a breach of the duty to advance defense costs. The Court further notes that Langdale's argument does not address the latter part of the applicable authority found in the above-stated *Danforth*

case in which the Court held that "[i]t is well established, however, that the doctrines of implied waiver and estoppel, based upon the conduct or action of the insurer, or its agent, are not available to bring within the coverage of a policy ... risks expressly excluded therefrom." *Danforth,* 282 Ga.App. at 427, 638 S.E.2d at 858–59. Allowing Langdale's *Hoover* argument would bring within coverage (in terms of the duty to defend standard that will be applied by analogy, *infra*) the risks described in the exclusions of 8 and 4(d), even though said risks were expressly excluded therefrom.

Next, the Court must reconcile the general rule that a party cannot create coverage by waiver or estoppel and *Hoover.* To perform this task, the Court starts with the first section of the above-stated quote from *Hoover,* which states:

> Under Georgia law, where an insurer is faced with a decision regarding how to handle a claim of coverage at the same time a lawsuit is pending against its insured, the insurer has three options. First, the insurer can defend the claim, thereby waiving its **policy defenses** and **claims of non-coverage.**

291 Ga. at 404, 730 S.E.2d at 416 (emphasis added).

■ It has been noted that in Georgia, defenses to an insurer's obligation to pay a claim fall into two general categories, policy defenses and coverage defenses. *Yeagley v. Allstate Ins. Co.,* No. 1:09–cv–19,–2009 WL 2486320, at *6 (N.D.Ga. Aug. 12, 2009). A "policy defense" is one in which "an insurer denies coverage based on the

---

**15.** One court has explained the difference between indemnity and liability as follows: "In analyzing insurance contracts, the timing of an insurer's duty to pay under an insurance policy is a feature that distinguishes a liability policy from an indemnity policy.... In general, under an indemnity policy the insurer is obligated only to reimburse the insured for [a]

covered loss that the insured himself has already paid. Under a liability policy, by contrast, the insurer's obligation to pay arises as soon as the insured incurs liability for the loss; the insured need not pay the loss first." *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Brown,* 787 F.Supp. 1424, 1429 (S.D.Fla. 1991) (internal quotations omitted).

insured's failure to fulfill a procedural condition of the insurance policy." *Id.* A "coverage defense," is a defense in which the insurer "argues that the insurance policy does not cover the specific injury in question." *Id.*

■ It appears to the Court that in *Hoover*, the opinion writer, the Honorable Carol Hunstein, recognized these two categories by utilizing the terms "policy defenses" and "claims of non-coverage," instead of the word "coverage defense." 291 Ga. at 404, 730 S.E.2d at 416. By not using the term "coverage defense" and considering the facts of *Hoover* (concerning a policy/notice defense), it appears to this Court that Justice Hunstein's further use of the word "defense" in the opinion must be referenced back to her initial use of the word and accordingly, limited as applying to policy defenses.[16] This interpretation of *Hoover*, allows the general rule that neither waiver nor estoppel can be used to create liability not created by an insurance contract and the holding in *Hoover* prohibiting the assertion of a different defense in the future to exist symbiotically. In essence, the Court reads the sentence of *Hoover* at issue as follows: "[a]n insurer cannot both deny a claim outright and attempt to reserve the right to assert a different [policy] defense in the future." [17]

Additional support for this understanding of *Hoover* is found in the *Southern Guar. Ins. Co. v. Dowse*, 278 Ga. 674(1), 605 S.E.2d 27 (2004), cited by Justice Hunstein in *Hoover* when setting forth the insured's second choice of denying coverage. Justice Hunstein relied upon section one of the holding in *Dowse*, which discusses denial of coverage, waiver, and reservation of rights; however, this Court finds subsection two of the *Dowse* opinion, which has not been overruled, to be particularly enlightening as to the present issue before the Court. In subsection two of the *Dowse* opinion, the Georgia Supreme Court stated:

> **By refusing to defend,** however, [insurer] **did not waive** its right to contest its insured's assertion that the insurance policy provides coverage for the underlying claim. Obviously, *if the underlying claim is outside the policy's scope of coverage, then [insurer's]refusal to indemnify or defend was justified* and it is not liable to make payment within the policy's limits. **This question of whether the policy provides coverage for the claim is separate from the legal consequences of an insurer's refusal to indemnify or defend.**

*Southern Guar. Ins. Co. v. Dowse*, 278 Ga. 674, 676, 605 S.E.2d 27, 29 (2004) (emphasis added).[18]

■ After review, the Court finds that National Union has not waived its claims of non-coverage.[19] Accordingly, the Court finds that there has been no waiver of National Union's claims of non-coverage,

---

16. Plaintiff in the case *sub judice* even discusses the waiver in terms of policy defenses. *See* Doc. No. 75, p. 38 ("Under decades of Georgia law, recently affirmed by the Supreme Court in *Hoover*, National Union waived all **Policy defenses** not raised in its first denial of coverage on November 1, 2, 2009.") (emphasis added).

17. The Court notes that in a post-*Hoover* case, *Facility Invests., LP v. Homeland Ins. Co. of New York*, 321 Ga.App. 103, 109, 741 S.E.2d 228, 233 (2013), the Georgia Court of Appeals used the term "Policy defenses" in a waiv-

er/assumption of the defense-reservation of rights analysis; however, it is not clear if the Georgia court was using the term under a procedure for uncovered loss allocation or as a claim for noncoverage. Without more, *Facility Invests.* does not provide guidance as to the issue presently before the Court.

18. The Georgia Court of Appeals has reaffirmed the holding in *Dowse*, post-*Hoover*. *See Khan v. Landmark Am. Ins. Co.*, 326 Ga.App. 539, 757 S.E.2d 151, 154 (Ga.App.2014).

19. To be clear, any policy defenses (as defined above to include a failure to fulfill a procedur-

which include its summary judgment arguments concerning Endorsement 8, Exclusion 4(d), and statutory material misrepresentations.[20]

### B. Breach of contract

▮▮▮▮ Under Georgia law, "[i]n an action to collect on an insurance policy, the insured must show that the occurrence was within the type of risk insured against to make a prima facie case." *Pa. Millers Mut. Ins. Co. v. Heule*, 140 Ga.App. 851, 852, 232 S.E.2d 267, 268 (1976).[21] "To recover in a suit on a contract, the complaining party must establish both a breach of the contract and resulting damages." *Graphics Prods. Distribs., Inc. v. MPL Leasing Corp.*, 170 Ga.App. 555, 555, 317 S.E.2d 623, 624 (1984); *see also Norton v. Budget Rent A Car Sys.*, 307 Ga. App. 501, 502, 705 S.E.2d 305 (2010) ("The elements for a breach of contract claim in Georgia are the (1) breach and the (2) resultant damages (3) to the party who has the right to complain about the contract being broken.") (citation omitted).[22] "A contract is breached by a party to it who is bound by its provisions to perform some act toward its consummation and who, without legal excuse on his part and through no fault of the opposite party, declines to do so." *CCE Fed. Credit Union v. Chesser*, 150 Ga.App. 328, 330, 258 S.E.2d 2, 4 (1979).

In this case, Langdale argues that National Union breached its contract of insurance on November 12, 2009 by failing and refusing to pay Langdale's defense cost for the Underlying Litigation. Doc. No. 50–1, p. 7.[23] Langdale states that National Union was required, under the policy, to advance Defense Costs prior to the final disposition of the claim. Doc. No. 75, p. 19.[24] Langdale states that "[c]omparing

---

al condition) not asserted in the initial denial of coverage letter were waived by National Union under the holding of *Hoover.* The Court finds that Endorsement 8, Exclusion 4(d) and statutory material misrepresentation are not policy defenses (as defined above), but claims of non-coverage, which have not been waived under *Hoover.*

**20.** By separate orders, the Court has resolved Langdale's request for *in camera* inspection [Doc. No. 45] and Motion for Relief Under Federal Rule of Civil Procedure 56(d) [Doc. No. 80] as they pertain to National Union's claims of non-coverage.

**21.** The parties seem to agree that Georgia law applies. *See Am. Family Life Assur. Co. of Columbus, Ga. v. U.S. Fire Co.*, 885 F.2d 826, 830 (11th Cir.1989) ("Federal jurisdiction in this case is based on diversity, and Georgia was the forum state. Under Georgia choice-of-law rules,. interpretation of insurance contracts is governed by the law of the place of making. Insurance contracts are considered made at the place where the contract is delivered. The insurance contracts in this case were delivered in Georgia. Consequently, Georgia substantive law controls.") (internal citations omitted).

**22.** As to the applicable standard for breach of contract, the Court notes that while providing a Northern District case cite to *Lubin v. Cincinnati Ins. Co.*, 2010 WL 5313754 (N.D.Ga. 2010), Langdale has quoted a non-Georgia standard.· Doc. No. 50–1, p. 15 The standard referenced by Langdale appears to be from Alabama case law. *See e.g., Hyde v. McDaniel*, No. 1:12–cv–02769, 2013 WL 2249043 (N.D.Ala. May 17,2013). The Court will apply the above-stated Georgia standard.

**23.** Langdale states that it is not currently seeking and has not sought indemnity from National union—only its defense costs. Doc. No. 50–1, p. 15.

**24.** There is an absence of argument from the parties as to whether the Underlying Litigation is actually at final disposition, as the record shows that the trial court granted summary judgment, but the Georgia Court of Appeals affirmed in part and reversed in part, so that the matter now returns to the trial court for further proceedings. *Nalley v. Langdale*, 319 Ga.App. 354, 734 S.E.2d 908 (2012). However, the absence of such argument is of no concern as neither party is contending that final adjudication is required. Doc. No. 85, p. 3, 8 n. 8.

certain allegations to the Policy, it is clear that the allegations implicate coverage." Doc. No. 50–1, p. 21. In response, National Union argues that the insurance contract purchased by Langdale excludes coverage under the circumstances present here, specifically the Policy's exclusions 4(g), Endorsement 8, and 4(d). Doc. No. 69–1, pp. 11, 22.

The parties disagree on whether the Court should apply a duty to defend (*i.e.,* look only to the allegations of the complaint) standard or entitlement to coverage standard (*i.e.,* look to all known facts). Doc. Nos. 68, p. 11; 75, p. 20.[25]

Neither party has cited to binding authority that is on all fours with the facts of this case in which there is a Policy that provides for advancement of defense costs, but also provides for the insured to repay the insurer such advanced payments in the event that the insured is not entitled to payment of such Loss[26] [Doc. No. 52–1, p. 31].

The Court has wrestled with the decision as to the correct standard to apply and ultimately concludes that it will apply the parameters of the duty to defend standard.

 Under the duty to defend standard, "whether an insurer has a duty to defend depends on the language of the policy as compared with the allegations of the complaint. If the facts as alleged in the complaint even arguably bring the occurrence within the policy's coverage, the insurer has a duty to defend the action." *Hoover,* 291 Ga. at 407–08, 730 S.E.2d 413 (internal citations omitted). "Where the claim is one of potential coverage, doubt as to liability and insurer's duty to defend should be resolved in favor of the insured." *Penn–Am. Ins. Co. v. Disabled Am. Veterans, Inc.,* 268 Ga. 564, 565, 490 S.E.2d 374, 376 (1997) (citations omitted). "To excuse the duty to defend the [complaint] must unambiguously exclude coverage under the policy." *BBL–McCarthy, LLC v. Baldwin Paving Co.,* 285 Ga.App. 494, 497, 646 S.E.2d 682, 685 (2007).

 "Under Georgia law, an insurer seeking to invoke a policy exclusion carries the burden of proving its applicability in a given case. An insurer can carry its burden of showing that a policy exclusion applies by relying exclusively upon the allegations against the insured in the underlying complaint." *First Specialty Ins. Corp., Inc. v. Flowers,* 284 Ga.App. 543, 544, 644 S.E.2d 453, 455 (2007). "[A]ny exclusion from coverage sought to be invoked by the insurer is to be strictly construed." *Cunningham v. Middle Ga.*

---

**25.** Langdale argues that the duty to defend standard, rather than a duty to indemnify standard, undoubtedly applies to this case and that the focus should not be on hindsight, after part of the Underlying Litigation has finished, but should instead be on foresight, based on the allegations of the Complaint at the time it was filed and the potential for coverage at that time. Doc. No. 75, pp. 20, 29, 37.

National Union argues that Langdale cannot rest upon a "duty to defend" standard and that Langdale must prove entitlement to coverage. Doc. No. 68, p. 10. National Union states that a key difference between the duty to defend and the obligation to reimburse defense costs, as here, is that in the event that it is ultimately determined that the claim is not covered, the insured is required to pay back advanced defense costs, because such costs are an insurable "Loss" only when the claim is actually (as opposed to "arguably") covered. Doc. No. 68, p. 11. National Union states that its argument has nothing to do with "when" defense costs should be paid, nor is it contending that final adjudication is required. Doc. No. 85, p. 3, 8 n. 8. National Union also cites authority concerning an insurer's obligation to give due consideration to an insured's contention and base the decision on true facts. *Id.* at p. 9 n. 8.

**26.** The definition of "Loss" in the Policy includes defense costs. Doc. No. 52–1, p. 23.

*Mut. Ins. Co.*, 268 Ga.App. 181, 185, 601 S.E.2d 382 (2004); *see also Barrett v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 304 Ga.App. 314, 321, 696 S.E.2d 326, 331 (2010) ("exclusions in an insurance policy are ... interpreted narrowly, in favor of the insured.") (citations omitted). "If the insurer meets its burden, 'the burden then shifts to the [insured] to come forward with other evidence creating a genuine issue of fact over whether the exclusion is applicable.'" *First Specialty, Ins.*, 284 Ga.App. at 544 n. 2, 644 S.E.2d at 455 (internal citations omitted).

▇▇▇▇▇ "[I]n construing an insurance policy, a court must first decide whether the language is clear and unambiguous." *Club Libra, Inc. v. R.L. King Props., LLC*, 324 Ga.App. 547, 548, 751 S.E.2d 418, 419 (2013) (internal quotations omitted). "Ambiguity exists when 'more than one reasonable construction may be placed upon the language of an agreement.'" *Estate of Pitts v. City of Atlanta*, 323 Ga.App. 70, 75–76, 746 S.E.2d 698, 702 (2013) (citations omitted). "[I]f an insurance contract contains 'contradictory clauses or other ambiguities ... they must be construed favorably to the insured and against the insurer.'" *Eells v. State Farm Mut. Auto. Ins. Co.*, 324 Ga.App. 901, 905, 752 S.E.2d 70, 74 (2013) (citations omitted). "If [the insurance policy] is [clear and unambigous], the court simply enforces the contract according to its clear terms; the contract alone is looked

to for its meaning.'" *Club Libra, Inc.*, 324 Ga.App. 547, 548, 751 S.E.2d 418, 419 (citations omitted).

In the case *sub judice*, the only ambiguity argument that has been raised by Langdale is as to Endorsement 8. Doc. No. 48, p. 60. The Court will address those arguments, *infra*. As to the remainder of the policy, as it appears that neither side is arguing ambiguity, the Court will enforce the contract as written. *Banks v. Bhd. Mut. Ins. Co.*, 301 Ga.App. 101, 102–03, 686 S.E.2d 872, 874 (2009).

The Court must now "compare the terms of the insurance contract to the allegations in the complaint to determine whether the underlying suit seeks damages for covered claims." *Bank of Camilla*, 939 F.Supp.2d at 1308. Then, the Court must consider whether National Union has carried its burden of showing that the policy exclusions that it has asserted over time apply to this case, *i.e.*, Endorsement 15, Exclusion 4(g), Endorsement 8, Exclusion 4(d). The Court will also consider National Union's statutory material misrepresentation arguments.

**1. Whether facts as alleged in the complaint arguably bring the occurrence within the policy's coverage**

The Policy provides coverage as follows:

**COVERAGE A: INDIVIDUAL INSURED INSURANCE**

This D & O Coverage Section shall pay the **Loss**[27] of an **Individual Insured**[28] of the Company arising from a **Claim**[29]

---

27. "**Loss**" means in relevant part, "damages, judgments, settlements, prejudgment and post-judgment interest ... and Defense Costs." Doc. No. 52–1, p. 23, ¶ u.

28. "**Individual Insured**" means any: (i) Executive of a Company; (ii) Employee of a Company; or (iii) Outside Entity Executive. Doc. No. 52–1, p. 23, ¶ s.

29. "**Claim**" means:
(i) a written demand for monetary or nonmonetary relief (including any re-

quest to toll or waive any statute of limitations);
(ii) a civil, criminal, administrative, regulatory or arbitration proceeding for monetary or nonmonetary relief which is commenced by:
(1) service of a complaint or similar pleading;
(2) return of an indictment, information or similar document (in the case of a criminal proceeding); or
(3) receipt or filing of a notice of charges; ....

made against such **Individual Insured** for any **Wrongful Act** [30] of such **Individual Insured,** except when and to the extent that the **Company** [31] has indemnified such **Individual Insured.** The **Insurer** shall, in accordance with and subject to Clause 7 of this D & O Coverage Section, advance **Defense Costs** [32] of such **Claim** prior to its final disposition.

Doc. No. 52–1, p. 20 (emphasis in original)

**COVERAGE B: PRIVATE COMPANY INSURANCE**

This **D & O Coverage Section** shall pay the **Loss of the Company** arising from a:

(i) **Claim** made against the **Company,** or

(ii) **Claim** made against an **Individual Insured,**

for any **Wrongful Act,** but, in the case of Coverage B(ii) above, only when and to the extent that the **Company** has indemnified the **Individual Insured** for such loss. The **Insurer** shall, in accor-

dance with and subject to Clause 7 of this **D & O Coverage Section,** advance **Defense Costs** of such **Claim** prior to its final disposition.

*Id.*

Langdale argues that as an Executive/Employee of Langdale, Johnny Langdale is an Individual Insured as defined by the Policy and there is no question that the allegations in the Underlying Litigation fall under the definitions of a Claim and a Wrongful Act. Doc. No. 50–1, p. 23. Langdale states that in comparing the allegations of the Complaint and Counterclaim in the Underlying Litigation to the Policy, it is clear that the allegations implicate coverage. *Id.* at p. 21. Langdale states that the Miller Lawsuit includes claims alleging wrongful acts made by Johnny Langdale as an Executive/Employee of Langdale and expressly seeks recovery from Mr. Langdale in Count Three captioned "Breach of Fiduciary Duty as Director," for alleged conduct in his capacity as an

---

Doc. No. 52–1, p. 21, ¶ (b).

**30.** "Wrongful Act" means:

(i) with respect to any **Executive** or **Employee** of a **Company,** any breach of duty, neglect, error, misstatement, misleading statement, omission or act by such **Executive** or **Employee** in their respective capacities as such, or any matter claimed against such **Executive** or **Employee** of a **Company** solely by reason of his or her status as an **Executive** or **Employee** of a **Company;**

(ii) with respect to a **Company,** any breach of duty, neglect, error, misstatement, misleading statement, omission or act by a **Company;** or

(iii) with respect to service on an **Outside Entity,** any breach of duty, neglect, error, misstatement, misleading statement, omission or act by **Outside Entity Executive** in his or her capacity as such. Doc. No. 52–1, pp. 24–25, ¶ cc.

The policy provides in relevant part that: "Employee" means any past, present or future employee, other than an Executive of a Company. Doc. No. 52–1, p. 22, ¶ m. "Exec-

utive" means: any past, present or future duly elected or appointed director, officer, management committee member or member of the Board of Managers. Doc. No. 52–1, p. 22, ¶ n(i).

**31.** According to the Policy, "Company" means the **Named Entity** and any **Subsidiary** thereof. Doc. No. 52–1, p. 10, ¶ (b). Langdale is the Named Entity under the Policy. Doc. No. 52–1, p. 3.

**32.** "Defense Costs" means the reasonable and necessary fees, costs and expenses consented to by the **Insurer** (including premiums for any appeal bond, attachment bond or similar bond arising out of a covered judgment, but without any obligation to apply for or furnish any such bond), resulting solely from the investigation, adjustment, defense and appeal of a **Claim** against an **Insured,** but excluding compensation of any **Individual Insured. Defense Costs** shall not include any fees, costs or expenses incurred prior to the time that a **Claim** is first made against an **Insured.** Doc. No. 52–1, p. 22, ¶ k.

Executive/Employee of Langdale. *Id.* at pp. 19–20; Doc. No. 68–1, p. 5, ¶ 10; Doc. No. 84, p. 57, ¶ 127. Langdale states that the complaint contains numerous other allegations made against Mr. Langdale in his capacity as an Executive/Employee of Langdale as the complaint alleges: (1) "at all pertinent times, Johnny and Harley, Jr. were officers and directors of [Langdale], were active in the management of the corporation"; (2) "Harley Jr. as longtime Chairman of [Langdale], and Johnny Langdale, as President of [Langdale], knew more about the true value of [Langdale] than anyone"; (3) "on May 27, 1999, Johnny Langdale and his lawyers obtained a Court Order authorizing him to resign as trustee"; (4) "in the activities recited herein, Defendants were, at various times, acting as individuals and/or officers and directors of [Langdale], and/or as Trustees of the 1959 Trust"; and (5) "in the activities recited herein, Defendants were, at times, acting both as Trustees and in one or the other of their other capacities." Doc. No. 50–1, p. 20.

Langdale further states that the November 13, 2009 Counterclaim that was filed in the Underlying Litigation against Langdale contained several allegations against Langdale and Johnny Langdale. *Id.* at p. 20. Langdale states that the Counterclaim alleged that Langdale aided and abetted the Trustees, made misrepresentations together with the Trustees, and schemed with the Trustees. *Id.* The Counterclaim also sought to hold Johnny Langdale liable as an Executive/Employee of Langdale and in Section E of the Counterclaim, it was alleged that Johnny Langdale was at various times acting as an individual and/or as Officer and Director of Langdale. *id.* at pp. 20–21.

The Counterclaim also included a Count V, "Respondeat Superior Liability of [The Langdale Company] for its Officers' Misconduct." Doc. No. 68–1, p. 8, ¶ 17.

In response, National Union argued that "[i]f the Claim is the Virginia Miller Trust Complaint/Counterclaim (as defined by the Policy), then [Langdale] satisfies the initial burden for the Complaint/Counterclaim...." Doc. No. 85, p. 5 n. 4. However, if the "Claim" were defined by the Policy as "a" cause of action most of the causes of actions listed in the Complaint and the Counterclaim are only about the trustees. [Thus, Langdale] cannot satisfy its initial burden of proving coverage for those causes of action." Doc. No. 85, p. 5 n. 4, p. 6.

The Court finds that under the policy and its definitions, the claim (as defined by the Policy) is the Complaint/Counterclaim in the Underlying Litigation, as the Complaint/Counterclaim is a "civil ... proceeding for monetary ... relief which is commenced by ... service of a complaint or similar pleading." Doc. No. 52–1, p. 21, ¶ b(ii). The Policy, in essence, provides coverage for the loss of an individual insured or the company arising from a claim made against the individual insured or the company for a wrongful act of such insured or the company (*i.e.*, any breach of duty, neglect, error, misstatement, misleading statement or omission, or act by such Executive/Employee in their respective capacity as such or by a company). The Court declines to uphold National Union's cause of action arguments to the contrary for purposes of this initial coverage determination.[33]

■ Here, the claims and allegations seeking relief in the Underlying Litigation, concerning wrongful acts made by Johnny

---

**33.** At oral argument, Langdale recognized the term "claim," as the whole lawsuit, not as a cause of action.

Langdale as an Executive/Employee of Langdale (through breach of director duty and other allegations) and wrongful acts of Langdale (by aiding and abetting, misrepresentation, and scheming) implicate coverage under the coverage sections of the policy at Doc. No. 52–1, p. 20. The Court accordingly finds that Langdale has satisfied its initial burden of proving arguable coverage for the Underlying Litigation Complaint/Counter Claim. The Court now considers National Union's arguments concerning exclusions.

## 2. The Policy exclusions

### a. Endorsement 15 [34]

The Policy that National Union has stipulated to be the true and correct copy of the Policy does not contain an Endorsement 15 and there is no genuine issue of material fact that Endorsement 15 is not a part of the Policy. Doc. No. 50–1, p. 26; Doc. No. 68–1, p. 15, ¶ 34. Accordingly, Endorsement 15 is not a basis upon which National Union can deny coverage.

### b. Exclusion 4(g)

#### (i.) applicability

Exclusion 4(g) states:

The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against an **Insured:** ... alleging, arising out of, based upon or attributable to any actual or alleged act or omission of an **Individual Insured** serving in any capacity, other than as an **Executive** or **Employee** of a **Company,** or as an Out-

side **Entity Executive** of an **Outside Entity;**[35]

Doc. No. 52–1, pp. 25–26.

National Union argues that there is no coverage pursuant to Exclusion 4(g) because the Claim " 'made against' [Langdale] and its former and current chief executive officers, Johnny and Harley, is a Claim 'alleging, arising out of, based upon or attributable to any actual or alleged act or omission of' Johnny and Harley serving in their capacities as trustees." Doc. No. 69–1, p. 11. National Union argues that Georgia courts have concluded that the "arising out of" language of an insurance policy excludes coverage for "ancillary acts" that might have been covered "but for" the fact that the "genesis" of the matter was excluded. Doc. Nos. 68, p. 17; 85, p. 7 n. 5 (citing *Cont'l Cas. Co. v. H.S.I. Fin. Servs., Inc.,* 266 Ga. 260, 466 S.E.2d 4, 5–6 (1996); *Manning v. USF & G Ins. Co.,* 264 Ga.App. 102, 589 S.E.2d 687 (2004); *Dynamic Cleaning Srv., Inc. v. First Fin. Ins. Co.,* 208 Ga.App. 37, 430 S.E.2d 33 (1993), and *Nat'l Reimbursement Grp., Inc. v. Gemini Ins. Co.,* No. 5:13–CV–145, 2013 WL 4495846 (M.D.Ga. Aug. 21, 2013)).

National Union states that "[t]he gravamen of the Virginia Miller Trust Litigation is the assertion that Johnny and Harley, as trustees, breached their duties to the Trust beneficiaries. Thus, 'but for' the acts of the trustee, the Claim against [Langdale] and its directors and officers would not have been made." Doc. No. 69–1, pp. 11–12.[36] National Union asserts

---

**34.** Langdale has filed a Motion to Strike and Objection to Evidence (specifically portions of the declaration of Aarica Williams) [Doc. No. 79] regarding Endorsement 15 never being a "placeholder" for Endorsement 8. Doc. No. 79, p. 13. The Court has addressed said motion by separate order.

**35.** As noted above, the Policy defines "Employee" in relevant part as "any past, present or future employee, other than an Executive

of a Company," Doc. No. 52–1, p. 22, ¶ m. "Executive" is defined in relevant part as "any past, present or future duly elected or appointed director, officer, management committee member or member of the Board of Managers." *Id.* at ¶ n(i).

**36.** National Union also references the opinion of the Georgia Court of Appeals (pertaining to the Underlying Litigation) that stated that the

that it was the actions of the two trustees that resulted in the Claim. Doc. No. 68, p. 18, National Union states: " 'But for' the alleged breach of fiduciary duty by the trustees, the allegations of wrongdoing against Langdale and its executives and employees would never exist." *Id.* National Union further states: "[i]rrespective of whether ancillary. wrongful acts of [Langdale] and its directors and officers contributed to the loss, those acts were not the 'genesis' of the trust beneficiaries' Claim; it was the acts of the trustees who controlled the trust. Thus, there is no coverage because the complaint/counterclaim arises out of the actual or alleged actions of the current and former [Langdale] chief executive officers` serving in their capacities as trustees—no matter how many ancillary wrongful acts by the company and its current and former chief executive officers are alleged." Doc. No. 68, p. 18. National Union argues that "[w]here the ancillary conduct (here, the alleged negligent acts of [Langdale] and its officers and directors) is a concurrent cause of the harm, the exclusion bars coverage." Doc. No. 85, p. 7.

In response, Langdale argues that National Union "purposefully misinforms this Court by ignoring Count Three of the 1343 Suit, titled 'Breach of Fiduciary Duty as Director' which sought to hold Mr. Lang-

dale and Harley Langdale, Jr. liable as Directors of Langdale." Doc. No. 75, p. 17 (emphasis omitted). Langdale also states that National Union does not mention "the several allegations specifically directed to Mr. Langdale's conduct as an officer and director of Langdale." *Id.* Langdale further argues that National Union has failed "to acknowledge the claims brought directly against Langdale in the Counterclaim, including a Count V 'Respondeat Superior Liability of [Langdale] for its Officers' Misconduct.' " *Id.* Langdale states that "[t]hese facts flatly contradict the statements National Union has made to this Court." Doc. No. 75, p. 17.

Langdale argues that "[e]xclusion 4(g) only bars coverage for **Wrongful Acts** committed *exclusively* in a capacity other than as an **Executive/Employee.** It does not purport to exclude conduct in dual capacities, i.e., simultaneously in insured and uninsured capacities as trustee and Executive/Employee." Doc. No. 50–1, p. 27 (emphasis in original). Langdale states that "[u]nder a plain reading of the Policy, National Union is contractually obligated to advance Defense Costs if any Claim (as opposed to all Claims) alleges any breach, omission, or act by an Executive/Employee of Langdale in their capacities as such." *Id.* at p. 28 (emphasis omitted).[37] Langdale states that "the plain language of the

---

consolidated cases involved the Trust beneficiaries "claiming ... that the trustees breached their fiduciary duties in administering the trust and distributing the trust corpus, which was comprised of stock held in The Langdale Company." *Nalley,* 319 Ga.App. at 354, 734 S.E.2d at 910. The Court has also found persuasive authority which supports Langdale's position. *See Am. Legacy Found., RP v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA,* 623 F.3d 135, 142–43 (3d Cir.2010). In opposition, Langdale presents hindsight arguments against reference to the Georgia Court of Appeals opinion. The Court notes that it is logical and works in the interest of judicial economy for said appellate opinion to be considered, especially in light of the fact that Policy provides that such advanced payments

shall be repaid by the Insured/Company in the event that they are not entitled and the appellate opinion supports non-entitlement [Doc. No. 52–1, p. 31]; however, the Court finds that even without consideration of the appellate opinion, the result is the same.

**37.** Langdale states that when there are potentially covered and potentially uncovered claims in the same lawsuit, the insurer is obligated to provide a defense (or advance Defense Costs) for the entire suit. *Colonial Oil Indus., Inc. v. Underwriters Subscribing to Policy Nos. T031504670 and T031504671,* 1995 WL 692691, at *7 (S.D.Ga.1995), *rev'd on other grounds,* 133 F.3d 1404 (11th Cir. 1998). Doc. No. 75, p. 31. To the extent that this argument addresses allocation, the Court

Policy provides coverage for 'any breach of duty, neglect, error, misstatement, misleading statement, omission or act by such Executive or Employee in their respective capacities as such.' " *Id.*

In reply, National Union argues that Exclusion 4(g) does not contain the word "exclusively," and Langdale offers no legal support for this pronouncement. Doc. No. 68, p. 18. National Union states that Langdale's pronouncement is the opposite of Georgia courts' interpretation of the "arising out of" language. *Id.* National Union further argues that Langdale's attempt to focus on "acts" to circumvent Exclusion 4(g) "ignores the language of the policy." Doc. No. 85, p. 4. National Union states that "the Exclusion is worded as excluding the Claim—not individual acts," as the "term Claim is defined as 'a civil ... proceeding for monetary ... relief which is commenced by ... service of a complaint or similar pleading.' " *Id.*[38]

The Court finds that National Union has set forth the correct interpretation of Georgia law in terms of the "arising out of" language. As recently stated by the Georgia Court of Appeals:

When the phrase "arising out of" is found in an exclusionary clause of an insurance policy, we apply the "but for" test traditionally used to determine cause-in-fact for tort liability. Notwithstanding tort liability theories, the underlying facts and circumstances of the claims asserted determine whether or not a policy exclusion applies, because

[t]he exclusionary clause is focused solely upon the genesis of the underlying plaintiffs claims—if those claims arose out of the excluded acts ... then coverage need not be provided. Claims arise out of [t]he excluded conduct when ' "but for" that conduct, there could be no claim against the insured.

*Hays v. Ga. Farm Bureau Mut. Ins. Co.,* 314 Ga.App. 110, 114, 722 S.E.2d 923, 927 (2012) (citations omitted).

■■■ Applying the "but for" analysis in the case *sub judice*, after review of the allegations of the Underlying Litigation, the Court concludes that the genesis of the underlying plaintiffs' claims involve the acts of the trustees and further concludes that the Claims (or allegations of wrongdoing) against Langdale and Johnny would not have occurred but for the acts (in the form of breach of fiduciary duty) of the trustees. Because the insurance policy specifically excludes any claim "arising out of" an act of an Insured serving in any capacity other than as an Executive/Employee, National Union had no duty to advance defense costs to Johnny or to Langdale.

To the extent that the Underlying Litigation includes Count Three of the 1343 Suit, titled "Breach of Fiduciary Duty as Director," several allegations specifically

---

will not consider matters of allocation at this stage of the case.

**38.** At oral argument, Langdale argued that 4(g) has no field of operation as to the Langdale, the company, as 4(g) states that it only applies to an individual insured. Langdale states that National Union ignored the independent claims asserted against Langdale in the counterclaim and make no argument as to why or how 4(g) would apply to Langdale, because it clearly does apply. Doc. No. 75, p. 55 n. 22. National Union asserts that: "because the Complaint/Counterclaim allege,

arise out of, is based upon or is attributable to actual or alleged acts or omissions of [Langdale's] current and former chief executive officers Harley Langdale, Jr. and Johnny Langdale, Jr. serving in their trustee capacities, there is no coverage for the Complaint/Counterclaim." Doc. No. 85, p. 5 n. 4. The Court upholds National Union's argument. The Court further finds that even if 4(g) has no field of operation as to the company, summary judgment is not precluded in light of the Court's conclusion as to Endorsement 8 and Exclusion 4(d), *infra.*

directed to Mr. Langdale's conduct as an officer and director of Langdale, and a Count V, alleging "Respondeat Superior Liability of [Langdale] for its Officers' Misconduct," the conclusion does not change, as the facts that gave rise to these causes of action arose out of the trustee's alleged wrongful actions. These counts/allegations are within the policy exclusion of 4(g).[39] The Court also notes, as stated by National Union, that Langdale's arguments focusing on the individual counts in the complaint and the acts of the officers is not determinative, as "the Exclusion is worded as excluding the Claim—not individual acts," and the "term Claim is defined as 'a civil ... proceeding for monetary ... relief which is commenced by ... service of a complaint or similar pleading.'" Doc. No. 85, p. 4.[40]

The Court is also unable to uphold Langdale's exclusively/dual capacity arguments [Doc. No. 50-1, p. 27] as Exclusion 4(g) does not contain such language.

### (ii.) prior admission (as to Exclusion 4(g))

Langdale argues that "National Union has acknowledged the inapplicability of Exclusion 4(g) by unconditionally agreeing to advance reasonable Defense Costs under the Policy on at least five occasions spanning from October 13, 2010 to April 1, 2011." Doc. No. 50-1, pp. 26, 29.

In response, National Union states that it made an "offer" and that Langdale never accepted its "offer" to advance part of the defense costs. Doc. No. 68, p. 9. Langdale states that "National Union's unconditional agreement to advance Defense Costs was neither an offer of compromise nor an offer." Doc. No. 75, p. 17.

For purposes of the Court's present analysis, it is not necessary to resolve whether National Union made an unconditional agreement or an offer, as the Georgia Court of Appeals has held that an insurer is not estopped to dispute its defense obligations by reason of having sent letters to the insured in which the insurer initially agreed to defend the underlying suit. *Ga. Farm Bureau Mut. Ins. Co. v. Vanhuss*, 243 Ga.App. 26, 26, 532 S.E.2d 135, 136 (2000). In *Vanhuss*, the court held that where the insured did not claim that he relied to his detriment on the insurer's initial decision to defend the suits and no such reliance appears, the insured is not estopped from later denying coverage. *Id.*; *see also Mahens v. Allstate Ins. Co.*, No. 1:10-cv-174, 2011 WL 1321578, at * 4 (N.D.Ga. Apr. 1, 2011) (citing *Danforth v. Gov't Emps. Ins. Co.*, 282 Ga.App. 421, 638 S.E.2d 852 (2007) (holding that insurer's assurances that it would pay for repairs, including its attempt to settle with [a third-party], did not waive right to deny coverage)).[41]

Here, as in the *Vanhuss* case, there is evidence of letters from the insur-

---

**39.** This holding even applies to the claims that remain pending against Langdale, as such pending claims were noted by Langdale at Doc. No. 75, p. 29 n. 9.

**40.** The term Claim is also defined as a "written demand for monetary or non-monetary relief," [Doc. No. 52-1, p. 21], which based upon Langdale's citation of authority, one court has held that each cause of action may constitute a separate claim. *AT & T Corp. v. Faraday Capital Ltd.*, 918 A.2d 1104, 1109 (Del.Supr.2007). Said court further recog-

nized that causes of action that "arise out of the same underlying wrongful conduct ... are deemed to be a single 'Claim.'" *Id.* This holding appears to be in line with the Georgia "arise out of" standard.

**41.** It appears that Georgia courts also recognize in the context of where an insured has led the insured to rely on a promise to pay is a waiver of the time limitation for bringing suit. *See Ga. Farm Bureau Mut. Ins. Co. v. Mikell*, 126 Ga.App. 640, 191 S.E.2d 557 (1972). Such is not at issue here.

er, National Union, indicating that defense costs would be advanced; however, there is no claim by Langdale that it relied on said letters to its detriment and no such reliance appears from the record. Accordingly, National Union is not estopped from its present arguments in which it denies coverage under 4(g).[42]

#### c. Endorsement 8

Endorsement 8 provides in relevant part:

SPECIFIC INVESTIGATION/CLAIM/LITIGATION/EVENT OR ACT EXCLUSION (D & O, EPL AND FLI COVERAGE SECTIONS)

In consideration of the premium charged, it is hereby understood and agreed that, solely with respect to **Loss** as may have otherwise been covered under the **D & O Coverage Section,** ... the **Insurer** shall not be liable to make any payment for any **Loss** in connection with: (i) any **Claim(s),** notices, events, investigations or actions referred to in any of items listed below (hereinafter "**Events**"); (ii) the prosecution, adjudication, settlement, disposition, resolution or defense of: (a) any **Event(s);** or (b) any **Claim(s)** arising from any **Event(s);** or (iii) any **Wrongful Act,** underlying facts, circumstances, acts or omissions in any way relating to any **Event(s):**

*Events:*

1. Claim # 145329, William Pope Langdale. Sr. et al 2/20/2007
2. Claim # 178423,[43] Robert H. Langdale et al, 8/14/2008
3. Claim # 186670, Natasha Sutton, 10/28/2008 (Race / Discharge) ·
4. Claim # 186763, Rickey Stacey, 08/01/2008 (Race / Discharge)

It is further understood and agreed that the **Insurer** shall not be liable for any Loss in connection with any **Claim(s)** alleging, arising out of, based upon, attributable to or in any way related directly or indirectly, in part or in whole, to an **Interrelated Wrongful Act** (as that term is defined below), regardless of whether or not such **Claim** involved the same or different Insureds, the same or different legal causes of action or the same or different claimants or is brought in the same or different venue or resolved in the same or different forum.

For the purposes of this endorsement an "**Interrelated Wrongful Act**" means: (i) any fact, circumstance, act or omission alleged in any Event(s) and/or (ii) any **Wrongful Act** which is **Related Wrongful Act**[44] to any **Wrongful Act** alleged in any **Event(s).**

Doc. No. 52–1, pp. 72–73.

National Union argues that there is no coverage for the present Claim because

---

**42.** In the briefing and in a separate Motion to Strike [Doc. No. 79], there are a number of arguments raised as to when National Union should have been able to determine that the 2008 State Suit was a part of the Events listed above and raise Endorsement 8. Langdale argues that if "National Union was not in a position to deny coverage in 2009 th[e]n [sic.] it should have advanced Defense Costs as required by the Policy and operated under a reservation of rights." Doc. No. 89, p. 4. Having resolved *Hoover* to permit additional coverage defenses, such as Endorsement 8, this argument is now moot.

**43.** National Union states that Event Number 1 correlates with the 2008 State Suit and Event Number 2 correlates with the 2008 Federal Suit. Doc. No. 69–1, p. 13. National Union states that it appears that a transcription error occurred in transcribing the Chubb claim number for the 2008 Federal Suit onto Endorsement 8. Doc. No. 68, p. 19 n. 4. Plaintiff has filed a motion to strike National Union's exhibits in support of its statements concerning the Chubb claim numbers. Doc. No. 79. By separate order, the Court has denied said motion.

**44.** "**Related Wrongful Act(s)**" means **Wrongful Act(s)** which are the same, related or

the facts alleged in the Underlying Litigation is "in any way related" to, "arises out of", and/or "refers to" the facts alleged in Paragraphs 38–42 of the 2008 State Suit (Johnny's Answer to which is attached as an exhibit to the 2008 Federal Suit). Doc. No. 69–1, p. 12.[45] National Union further states: the Underlying Litigation "arises out of" and is "in any way related" to the same facts alleged and the wrongful acts identified in Paragraphs 38–42 of the 2008 State Suit. Doc. No. 68, p. 23. National Union states: in the 2008 State Suit, the plaintiff alleged that, "Harley Langdale, Jr. and Johnny Langdale convinced the Virginia Miller Langdale family that they should sell their shares of stock out of their trust back to the Company for a price far below the market value of the shares at the time," and "Harley Langdale, Jr. has been led to believe that he must work with Johnny Langdale in and [sic] effort to secure Johnny Langdale and his son's full and absolute control and ownership over the Company." Doc. No. 69–1, p. 15; Doc. No. 68–5, pp. 9–10, ¶¶ 40, 42. In the Underlying Litigation (counterclaim), the Virginia Miller Trust beneficiaries stated, "[T]he Trustees … embarked on a scheme … to make the Trustees' control over TLC [46] permanent, to have TLC redeem the Trust's stock and to do so at an absurdly low price." Doc. No. 69–1, p. 15; Doc. No. 52–8, p. 36, ¶ 59.

National Union further argues that the Policy makes clear in Endorsement # 8

that regardless of whether the 2008 State Suit "involved the same or different Insureds, the same or different legal causes of action or the same or different claimants," there is no coverage for the Underlying Litigation. Doc. No. 68, p. 23. National Union cites the following cases in support of its argument: *HR Acquisition I Corp. v. Twin City Fire Ins. Co.*, 547 F.3d 1309 (11th Cir.2008); *Am. Gen. Life Ins. Co. v. Ace Ins. Co.*, 131 Fed.Appx. 217 (11th Cir.2005); and *S.P. Syntax LLC, et al v. Nat'l Union Fire Ins. Co. of Pittsburgh. Pa.*, et al., Civil Action No. CV 2011–019071 (Sup.Ct. Az. June 19, 2012).[47] Doc. No. 69–1, p. 14.

In response, Langdale argues that National Union is not entitled to summary judgment as to Langdale's breach of contract and declaratory judgment causes of action on the basis of Endorsement 8. Doc. No. 69–1, p. 16. Langdale states that "[c]ourts interpreting policy exclusions nearly identical to National Union's exclusion and National Union's own policies indicate that in order for a Claim to be excluded under this exclusion there must be a logical nexus or common nucleus of operative facts between the tendered Claim and the pre-existing Wrongful Act(s)." Doc. No. 75, p. 40. Langdale cites the following cases in support of its argument: *Fed. Sav. & Loan Ins. Corp. v. Burdette*, 718 F.Supp. 649 (E.D.Tenn. 1989); *Eureka Fed. Sav. & Loan Ass'n v.*

---

continuous, or **Wrongful Act(s)** which arise from a common nucleus of facts. **Claims** can allege **Related Wrongful Act(s)** regardless of whether such **Claims** involve the same or different claimants, **Insureds** or legal causes of action. Doc. No. 52–1, p. 11, ¶ 1.

**45.** National Union states: "Paragraphs 38 to 42 of the Amended Complaint in the 2008 State Suit (identified as Claim # 145329 on Endorsement 8) made allegations about Johnny and Harley's fraudulent conduct in connection with [Langdale's] purchase of shares

from the Virginia Miller Trust, alleging that they swindled the Trust beneficiaries into selling their shares back to the company for a price far below the market value of the shares at the time." Doc. No. 85, pp. 9–10.

**46.** As noted above, TLC refers to The Langdale Company—Plaintiff, herein.

**47.** Langdale argues that *Syntax* actually supports its position, discussed *infra*, rather than National Union's position. Doc. No. 75, p. 41.

*Am. Cas. Co. of Reading, Pa.*, 873 F.2d 229 (9th Cir.1989); *Nat'l Union Fire Ins. Co. of Pittsburgh v. Cont'l Illinois Corp.*, 673 F.Supp. 300 (N.D.Ill.1987); *AT & T Corp. v. Faraday Capital Ltd.*, 918 A.2d 1104, 1109 (Del.2007); *Okada v. MGIC Indem. Corp.*, 608 F.Supp. 383 (D.Haw.1985), *aff'd in part, rev'd in part*, 795 F.2d 1450 (9th Cir.1986); and *Cont'l Cas. Co. v. Wendt*, 205 F.3d 1258 (11th Cir.2000).[48] Doc. No. 75, pp. 40–41. ·

Langdale argues that pursuant to the wording of Endorsement 8 as well as the case law, "the focus has to be on the fact-intensive inquiry as to whether the Wrongful Acts are logically related and arise out of a common nucleus of operative facts." Doc. No. 75, p. 42. Langdale states that in examining the complaints of the 2008 State and 2008 Federal lawsuits, as well as the evidence, and the declaration of the attorney with personal knowledge of both (*i.e.*, Thomas Richey, Esq., Doc. No. 77–52),[49] this examination establishes that none of these lawsuits had anything to do with the other. *Id.*[50] Langdale states that in viewing the actual facts and applicable law, this Court can determine as a matter of law that Endorsement 8 is inapplicable. *Id.* at

p. 45. Langdale states: "it is clear that the Underlying Litigation cannot be related to the 2008 State and 2008 Federal Suits. First, the requisite nexus is missing because the claims are based on entirely different conduct. Second, the Underlying Litigation arose and was ripe before the conduct giving rise to the 2008 State and 2008 Federal Suits occurred." *Id.* Langdale states: "[t]he actual Claims made in the Underlying Litigation had absolutely nothing to do with the 2008 State or Federal Suit." *Id.* at p. 46.

In response, National Union states: "[t]hese allegations are not merely 'related' or deriving from the same nucleus of fact; they are the same alleged facts." Doc. No. 85, p. 10 (emphasis omitted). National Union states that "Endorsement 8 excludes 'Loss in connection with any Claim(s) ... in any way related ... to an Interrelated Wrongful Act' ..... [and] Interrelated Wrongful Act means, among other things, 'any fact ... alleged in any Event.'" *Id.* at p. 11. Therefore, the Miller Litigation "(*i.e.*, the Claim) is related to a fact alleged in the 2008 State Suit (i.e., an Event)." *Id.*

---

**48.** The Eleventh Circuit was considering Florida law in the *Cont'l Cas. Co.* case and concluded that persuasive authority found in the Seventh Circuit interpreting the term "relate" was harmonious with Florida law. 205 F.3d at 1263.

**49.** In his declaration, Attorney Thomas Richey states that he has in the past been retained by Langdale to represent it in litigation and other proceedings. Doc. No. 77–52, p. 9, ¶ 14. He stated that "[n]one of the twelve improper transactions alleged in the 2008 Shareholder Action referenced, arose out of, or were any way related to the Virginia Miller Family Redemption Transactions." *Id.* at ¶ 18. He stated that "[n]one of the counts and none of the prayers for relief contained in the 2008 Shareholder Action related in any way to the Redemption Transactions." *Id.* He further stated that the four paragraphs in

the 2008 Shareholder Complaint that refer to the Redemption Transactions "are mere inflammatory surplusage because they do not support the alleged claims in any way ... were wholly unrelated to ... the derivative demand and the rest of the 2008 Shareholder Action concerned [and] are explicitly included to 'illustrate' an alleged point of historical background." *Id.* at ¶ 20.

**50.** Langdale argues that "the 2008 State Suit (W.P. Langdale) involved acts of alleged corporate mismanagement that post-dated the Virginia Miller transaction, i.e., the alleged Wrongful Acts in the 2008 State Suit occurred after the alleged claims of Virginia Miller had accrued ... [and] the wrongs alleged in that case were corporate in nature and any recovery should have gone to the corporation, not individual shareholders." Doc. No. 75, p. 44.

National Union further argues that Langdale's argument that Endorsement 8 does not apply because the alleged bad acts described in the 2008 State Suit occurred after the alleged bad acts described in Underlying Litigation ignores "the language in the 2008 State Suit which contains allegations of fact in Paragraphs 38 to 42 that are identical to those in the Virginia Miller Trust litigation," therefore, "the events occurred at the same time as those alleged in the Virginia Miller Trust Litigation." Doc. No. 85, p. 11. National Union further argues that Langdale's contentions that the differences in the character of the causes of actions and the parties renders Endorsement 8 inapplicable fails in the face of the unambiguous wording of Endorsement 8, which "excludes Loss in connection with any Claim related to a fact alleged in the 2008 State Suit 'regardless of whether or not such Claim involved the same or different Insureds, the same or different legal causes of action or the same or different claimants....'" *Id.* at pp. 11–12. National Union states that accordingly, the differences recognized by Langdale, "do not negate the applicability of Endorsement 8." *Id.* at p. 12.

 After review, the Court finds that National Union has established its burden of showing that Endorsement 8 bars Langdale's claim for the Underlying Litigation. National Union has established said burden under both the plain language of the policy and the citation of authority that Langdale relies upon, *supra.*[51] As stated by National Union, "Endorsement 8 excludes 'Loss in connection with any Claim(s) ... in any way related ... to an Interrelated Wrongful Act....'" "Interrelated Wrongful Act means, among other things, 'any fact ... alleged in any Event.'" Doc. No. 52–1, pp. 72–73. The Underlying Litigation "arises out of" and is "in any way related" to the same facts alleged and the wrongful acts identified in Paragraphs 38–42 of the 2008 State Suit. The fact intensive inquiry, requested by Plaintiff, inclusive of a review of Attorney Richey's affidavit, does not yield a different conclusion.[52]

Lastly, Langdale argues that there is no evidence as to how National Union construed and applied Endorsements and Endorsement 8 is ambiguous, as illustrated by the different interpretation of its meaning by the corporate representative, Aarica Williams and the interpretation of National Union's lawyers in the present motion. Doc. No. 75, p. 48. Langdale argues that the Court should apply the interpretation of the corporate representative (*i.e.*, that related means "if the persons filing the lawsuit have litigated against Langdale") and deem Endorsement 8 inapplicable. *Id.* at pp. 47–48.

In response, National Union cites *St. Paul Mercury Ins. Co. v. Miller,* 968 F.Supp.2d 1236, 1239 (N.D.Ga.2013) (citations omitted) in which the court held:

What matters is this Court's legal interpretation of the language of the policy.... To the degree that the [party seeking coverage] asserts that [the insurance company's] internal documents will provide insight into the intent of the parties, "we do not consider any extrin-

---

51. Langdale has also not cited any binding authority or Georgia law to the contrary of *National Union's* analysis under the policy.

52. Plaintiff also raises common sense and slippery slope arguments as to National Union's interpretation in its request for oral ar-

gument [Doc. No. 87, p. 4]; however, "[i]f a policy exclusion is unambiguous ... it must be given effect 'even if beneficial to the insurer and detrimental to the insured. [The court] will not strain to extend coverage where none was contracted or intended,'" *Hays,* 314 Ga.App. at 112, 722 S.E.2d at 926.

sic evidence of the parties' intent when the contract language is unambiguous."

In regard to the ambiguity argument, National Union argues the absence of ambiguity and therefore; extrinsic evidence, through the testimony of Ms. Williams, should not be considered by the Court. *See Stewart v. KHD Deutz of Am., Corp.,* 980 F.2d 698, 702 (11th Cir.1993).

As stated above, "[a]mbiguity exists when 'more than one reasonable construction may be placed upon the language of an agreement.'" *Estate of Pitts,* 323 Ga. App. at 75–76, 746 S.E.2d 698 (citations omitted).

The Court finds that Endorsement 8 is not ambiguous and is not rendered ambiguous based upon Ms. Williams' testimony, as "[i]n construing an insurance contract the test is not what the insurer intended its words to mean, but rather what a reasonable person in the insured's position would understand them to mean." *Gulf Ins. Co. v. Mathis,* 183 Ga.App. 323, 324, 358 S.E.2d 850 (1987). The Court will accordingly give effect to the exclusion. *Hays,* 314 Ga.App. at 112, 722 S.E.2d at 926 ("If a policy exclusion is unambiguous, however, it must be given effect 'even if beneficial to the insurer and detrimental to the insured. [The court] will not strain to extend coverage where none was contracted or intended.'").

As to the 2008 Federal Suit, Langdale asserts that "National Union's only argument that the Underlying Litigation is related to the 2008 Federal Lawsuit is because the Answer from the 2008 State Suit was attached as an exhibit to the 2008 Federal Suit." Doc. No. 75, p. 44. Langdale states that "National Union cannot seriously argue, under the plain language of Endorsement 8, that the attachment of an Answer as an exhibit to another lawsuit bars coverage." *Id.*

The Court agrees that National Union has not carried its burden of showing that the 2008 Federal Suit excludes coverage of the Underlying Litigation under Endorsement 8, based upon Johnny's Answer to the 2008 State Suit being attached as an exhibit to the 2008 Federal Suit. Without more, said circumstances do not show that the facts alleged in the Underlying Litigation is "in any way related" to, "arises out of", and/or "refers to" the 2008 Federal Suit. Doc. No. 69–1, p. 12.

### d. Exclusion 4(d)

Exclusion 4(d) states:

> The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against an Insured:
>
> .... alleging, arising out of, based upon or attributable to the facts alleged, or to the same or **Related Wrongful Act(s)** alleged or contained in any claim which has been reported, or in any circumstances of which notice has been given, under any policy of which this **D & O Coverage Section** is a renewal or replacement of in whole or in part or which it may succeed in time;

Doc. No. 52–1, p. 26.

National Union argues that there is no coverage for the Claim because the misconduct alleged in the Virginia Miller Trust Litigation alleges, arises out of, is based upon, or is attributable to the facts alleged in the 2008 State Suit and the 2008 Federal Suit, both of which were reported under Langdale's previous Directors and Officers policy. Doc. No. 69–1, p. 16. National Union states:

> [i]t is undisputed that the 2008 State Suit was reported to [Langdale's] prior Directors and Officers insurance company. The [underlying] litigation is a Claim "alleging, arising out of, based upon or attributable to the facts alleged" in the 2008 State Suit, The alleged facts about misconduct in connection with the Redemption Transactions were known prior to the Policy's inception and were

explicitly stated in the prior litigation. In addition, the [underlying] is a Claim that alleges, arises out of, is based upon or attributable to the same or Related Wrongful Act(s) alleged or contained in the 2008 State Suit. Accordingly, there is no coverage under the Policy.

Doc. No. 68, p. 24 (internal citations omitted).

In response, Langdale argues that the two express conditions of 4(d) are not present here. Doc. No. 75, p. 48. Langdale asserts that it "never tendered the Underlying Litigation to any carrier other than National Union ... [and] National Union fails to present any facts that indicate how the Wrongful Acts alleged in the Underlying Litigation, all of which occurred prior to those in the 2008 State and Federal Suit, can possibly 'arise out of or be 'based upon' Wrongful Acts that were alleged to have occurred after the 1999 and 2000 stock redemption transactions.'" *Id.* at p. 49. Langdale also argues that National Union's argument fails on the ground that the Underlying litigation is not "related" to any prior litigation. *Id.*

In reply, National Union argues that it is not relevant that Langdale never tendered the Underlying Litigation to any other carrier than National Union, as Exclusion 4(d) is not contingent on whether Langdale reported the Underlying Litigation to its prior D & O carrier. Doc. No. 85, p. 13. National Union states that the "exclusion applies to a Claim which arises out of (or is based upon) facts alleged in a prior lawsuit that was reported to the prior D & O carrier .... [and] it is undisput-

ed that the 2008 State Suit and the 2008 Federal Suit were reported to Federal Insurance Company, [Langdale's] prior D & O carrier." *Id.* National Union states that there is accordingly, "no coverage for the Claim because the misconduct alleged therein alleges, arises out of, is based upon, or is attributable to the facts alleged in the 2008 State Suit and the 2008 Federal Suit, both of which were reported under [Langdale's] previous Directors and Officers policy." *Id.*

■ Based upon the considerations as to Endorsement 8, *supra*, the Court finds that National Union has met its burden as to Exclusion 4(d) as to the 2008 State Suit only. The Court agrees that under the language of the policy, it is not relevant that the Underlying Litigation was never reported to a prior D & O carrier.

### e. Material Omission

National Union argues that there is no Coverage for the Underlying Litigation due to Langdale's material omissions during the Underwriting Process. Doc. No. 69–1, p. 22.[53] National Union argues that O.C.G.A. § 33–24–7 of the Georgia Insurance Code bars coverage due to Langdale's deliberate withholding of reporting the 1343 Suit, even though the underwriting process was ongoing, because it wanted to obtain the policy before reporting the lawsuit. *Id.* at p. 23.

A review of the record shows that National Union issued a temporary binder for Directors and Officers coverage to Langdale on March 31, 2009, April 30, 2009, and May 30, 2009.[54] The effective date of the

---

**53.** National Union states that it is not seeking rescission, only a determination of no coverage. Doc. No. 85, p.14. Therefore, Langdale's arguments concerning the absence of a right to rescind are not applicable. Doc. No. 75, p. 52.

**54.** Each temporary binder included a provision that stated: "A condition precedent to

coverage afforded by this Conditional Binder is that no material change in the risk occurs and no submission is made to the Insurer of a claim or circumstances that might give rise to a claim between the date of this Conditional Binder indicated above and the Effective Date." Doc. No. 77–40, p. 8; Doc. No. 77–41, p. 8; Doc. No. 77–42, p. 8.

Policy remained April 1, 2009 with every continuation of the temporary binder. On July 2, 2009, National Union mailed the Policy to Langdale; however, the Policy erroneously included an Endorsement 15. Endorsement 15 never was referenced on any of the binders issued by National Union and was not intended to be a part of the coverage bound. On July 7, 2009, National Union mailed a correct Policy to Langdale as originally bound with an effective date of April 1, 2009.

National Union states that discovery in this case revealed that during the negotiation of the insurance contract after the Policy's inception date, Langdale advised its broker about the Miller Litigation ("1343 Suit") and on June 14, 2009, the broker responded by advising Langdale that it should report the claim. Doc. No. 68, p. 25. National Union states that Langdale "ignored this recommendation and intentionally chose not to disclose the 1343 Suit to National Union," but waited two months, until August 4, 2009 to report the 1343 suit (after it obtained the final version of the Policy in July 2009). *Id.* National Union cites a Langdale internal communications in support of its argument. *Id.* National Union states that on June 25, 2009, internal communications reveal that a Langdale employee reported to Greg Miller, the Chief Financial Officer of The Langdale Company, that there was a "need" to report the lawsuit to National Union. Doc. Nos. 68, p. 25; 68–13, p. 2. In response, Mr. Miller stated "we need the policy." Doc. No. 68–13, p. 2.

The Georgia Insurance Code § 33–24–7(b)(3) provides in relevant part:

> [m]isrepresentations, omissions, concealment of facts, and incorrect statements shall not prevent a recovery under the policy or contract unless ... [t]he insurer in good faith would either not have

issued the policy or contract or would not have issued a policy or contract in as large an amount or at the premium rate as applied for or would not have provided coverage with respect to the hazard resulting in the loss **if the true facts had been known to the insurer as required either by the application for the policy or contract or otherwise.** (emphasis added).

*See also Hamilton v. Mecca, Inc.,* 930 F.Supp. 1540, 1549 (S.D.Ga.1996) ("The defense created by § 33–24–7(b) is based upon the obvious proposition that it is the insurer that assumes the risk of coverage under an insurance policy and an insured's failure to reveal relevant information alters the risk undertaken by the insurer.").

Under Georgia law, the insurer bears the burden of proof under § 33–24–7(b), *see e.g., Nat'l Life & Accident Ins. Co. of Tenn. v. Camp,* 77 Ga.App. 667, 49 S.E.2d 670, 672 (1948). It has been held that an underwriter's statement that the insurance company would not have issued the policy as applied for can be sufficient to shift the burden to the plaintiff to show that the misrepresentation was not material. *Dracz v. Am. Gen. Life Ins. Co.,* 427 F.Supp.2d 1165 (2006), *aff'd,* 201 Fed. Appx. 681 (2006).

National Union argues that § 33–24–7 bars coverage due to Langdale's deliberate withholding of reporting the 1343 Suit, even though the underwriting process was ongoing, because it wanted to obtain the policy before reporting the lawsuit. Doc. No. 69–1, p. 23. National Union states that its witness's testimony [specifically the declaration of Aarica Williams, Doc. No. 68–8, ¶ 22][55] establishes that the existence of the litigation was material to the risk is sufficient to carry National Union's burden to this regard. Doc. No. 85, p. 14.

---

**55.** Langdale has filed a motion to strike [Doc. No. 79] portions of the declaration of Aarica Williams. The Court has addressed this motion by separate order.

In support of its argument, National Union cites: *Perkins v. Am. Intern. Specialty Lines Ins. Co.*, 486 B.R. 212, 219 (N.D.Ga. 2012) and *Mass. Bay Ins. Co. v. Hall*, 196 Ga.App. 349, 395 S.E.2d 851, 854–55 (1990). Doc. No. 85, p. 14.[56]

In response, Langdale argues that National Union's argument is without legal support and that it is factually wrong to rely on § 33–24–7, as it is uncontradicted that Langdale did not know about the underlying litigation until coverage was bound and there is no evidence that Langdale made a material misrepresentation to National Union during the underwriting process—only argument that Langdale suppressed the fact that Johnny Langdale was sued on May 21, 2009 (after the Policy was bound). Doc. No. 75, pp. 49, 51, 53.

Langdale essentially argues that National Union has confused notice of claim with allegations of fraud. *Id.* at p. 50. Langdale states that National Union has admitted through its claims adjuster, Douglas Croland, that timing of the notice is not an issue. *Id.*[57] In response to Langdale's arguments, National Union argues that nothing in § 33–24–7 carves out material omissions made after the issuance of a conditional binder. National Union further states that the language of § 33–24–7 shows that it "applies to any misrepresentation or omission that is material to the acceptance of the risk or to the hazard assumed by the insurer." Doc. No. 85, p. 14.

Langdale also argues an absence of a duty to disclose. Doc. No. 75, p. 53. Langdale cites *Executive Risk Indemn., Inc. v. AFC Enterp., Inc.*, 510 F.Supp.2d. 1308, 1324 (N.D.Ga.2007) in support of its argument regarding absence of a duty to

disclose. Doc. No. 75, p. 53. In *Executive Risk*, the court did not specifically find, but assumed that there was a duty to update in the policy, and stated that the duty could be no broader than the contract of insurance. 510 F.Supp.2d at 1328. The contract provided that if there was a material change in the questions answered by the insured in its application, prior to the policy inception date, the insured was to notify the insurance company. The court found that the insured had admitted that none of the insurer's answers were incorrect or false, therefore, there was no material change and no violation of the duty to update. The Court notes that *Executive Risk* is not on all fours with the facts of this case, as the insurance company (National Union) has not admitted that Langdale's omission was not material, nor is the language from the *Executive Risk* policy similar to the present policy.

The Court addresses Langdale's arguments in turn.

The Court is unable to uphold Langdale's suppression of fact argument, as the Georgia Court of Appeals has held that § 33–24–7(b) "applies to 'incorrect statements' as well as to 'misrepresentations, omissions, (and) concealment of facts.'" *Marchant v. Travelers Indem. Co. of Illinois*, 286 Ga.App. 370, 374, 650 S.E.2d 316, 319 (2007) (internal citations omitted). The Georgia Supreme Court has also held that "[s]uppression of a material fact which a party is under an obligation to communicate constitutes fraud." *Block v. Voyager Life Ins. Co.*, 251 Ga. 162, 164, 303 S.E.2d 742, 744 (1983).

---

**56.** In its Rule 56(d) motion, Langdale states that "National Union's corporate witness, Aarica Williams, did not support the accusation of misrepresentation or omission .... she testified that she was unaware of any misrepresentations." Doc. No. 89, p. 15.

**57.** Langdale further states that "National Union has never challenged ... notice of the Counterclaim. It was tendered within 12 days of its filing." Doc. No. 75, p. 50 n. 20.

As to Langdale's duty to disclose arguments, the Court recognizes that the Georgia Court of Appeals has held that "unless the insurance company establishes that the insured knew about the purported material factor in assessing the risk or unless it is contained in the application then we find no basis for disclosure." *Ga. Farm Bureau Mut. Ins. Co. v. First Fed. Sav. & Loan Ass'n of Statesboro,* 152 Ga.App. 16, 18, 262 S.E.2d 147, 149 (1979). The language of § 33–24–7(c) indicates that the "true facts" had to have been "as required either by the application for the policy or contract or otherwise."

It appears to the Court that at oral argument, National Union argued as the basis for disclosure the language of the above-stated temporary binders and the fraud language found in the renewal application that National Union allowed Langdale to submit. Doc. No. 68–8, p. 76. As stated above, each temporary binder included a provision that stated: "A condition precedent to coverage afforded by this Conditional Binder is that no material change in the risk occurs and no submission is made to the Insurer of a claim or circumstances that might give rise to a claim **between the date of this Conditional Binder indicated above and the Effective Date.**" Doc. No. 77–40, p. 8; Doc. No. 77–41, p. 8; Doc. No. 77–42, p. 8 (emphasis added). The application's fraud notice provides in relevant part:

> Fraud Notice to Applicants: Any person who, for the purpose of misleading, submits an application for insurance or a statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material to such application or claim, may be guilty of a fraudulent insurance act, which may be

a crime and also may subject such person to civil penalties.

Doc. No. 68–8, p. 76.

As to the temporary binder, Langdale argues that the problem with National Union's argument is that the temporary binders were all issued after the policy's effective date. After review of the arguments, the Court finds that National Union has not sufficiently addressed Langdale's timing arguments so that summary judgment is not warranted on this ground.

As to National Union's fraud notice arguments, the Court has reviewed the entire application (at Doc. No. 68–8), inclusive of the fraud notice and is unable to locate a question in which Langdale was asked to report information related to a claim concerning pending litigation. National Union's arguments are not sufficient to meet its summary judgment burden to this regard.

Accordingly, the Court finds that National Union has not sufficiently established that there was a duty to disclose and summary judgment is not warranted on the material omissions defense at this time.[58]

## C. Declaratory judgment

Langdale seeks a declaration from this Court that National Union is obligated to advance reasonable Defense Costs to Langdale up to the Policy limits of $10 million for the ongoing defense of the Underlying Litigation. Doc. Nos. 7, p. 41; 50–1, p. 30.

Having granted summary judgment in favor of Defendant on Plaintiff's breach of contract claims, the Court finds that Plaintiff is not entitled to a declaratory judgment.

---

**58.** In light of the previous findings as to Exclusion 4(g), Endorsement 8, and Exclusion 4(d), the Court's ruling as to the statutory

material omissions defense does not prevent the grant of Defendant's motion for summary judgment.

**1318**

### D. Bad faith refusal to advance defense costs

Langdale asserts a bad faith claim under O.C.G.A. § 33–4–6, which provides for liability of an insurer for damages and attorney's fees on bad faith refusal to pay insurance claims.

■ In response, National Union argues that there can be no bad faith where is no coverage. In support of its argument, National Union cites: *BayRock Mortg. Corp. v. Chicago Title Ins. Co.*, 286 Ga.App. 18, 648 S.E.2d 433 (2007). In *BayRock*, the Georgia Court of Appeals stated:

> To prevail on a claim for an insurer's bad faith under OCGA § 33–4–6, the insured must prove: (1) that the claim is covered under the policy, (2) that a demand for payment was made against the insurer within 60 days prior to filing suit, and (3) that the insurer's failure to pay was motivated by bad faith. OCGA § 33–4–6. Since the statute imposes a penalty, its requirements are strictly construed.

*Id.* at 19, 648 S.E.2d at 435.

Through the analysis above, the Court has found that the Underlying Litigation claim is not covered under the Policy. Accordingly, Plaintiff cannot establish the first element of the bad faith claim concerning coverage under the policy. Plaintiff being unable to establish the element of a bad claim, summary judgment is warranted in favor of Defendant. *See One-Beacon Am. Ins. Co. v. Catholic Diocese of Savannah*, 477 Fed.Appx. 665, 673 (11th Cir.2012) ("Under Georgia law, there can be no recovery for bad faith when there is no coverage.").

### Conclusion

Plaintiff's Motion for Partial Summary Judgment [Doc. No. 50] is hereby **DENIED**.

Defendant's Motion for Summary Judgment [Doc. No. 69] is hereby **GRANTED**.

The Clerk is **DIRECTED** to enter judgment in favor of Defendant and close this case.